IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>          vs.<br><br>UNIVERSITY OF NEBRASKA,<br>UNIVERSITY OF NEBRASKA BOARD<br>OF REGENTS, JAKE JOHNSON, LAURIE<br>BELLOWS, MEAGAN COUNLEY, and<br>TONI ANAYA,<br><br>                    Defendants. | **4:18CV3142**<br><br><br>**MEMORANDUM<br>AND ORDER** |

This matter is before the court on Defendants' motion for partial summary judgment, which seeks dismissal of a § 1983 claim alleged in Count VI of Plaintiff's Amended Complaint. Defendants assert the claim "is barred by qualified, absolute, quasi-judicial and sovereign immunity, and on the merits for lack of a genuine issue of material fact." (Filing No. 39, p. 1.) For the reasons discussed below, the motion will be granted and Count VI will be dismissed with prejudice.

## I. BACKGROUND

Plaintiff, suing under the anonym of John Doe, was a Ph.D. student in the Political Science Department at the University of Nebraska–Lincoln ("UNL"), from August 2015 until May 2018, when he was expelled for violating the student code of conduct. Specifically, it was determined that Plaintiff sexually assaulted another UNL student ("Jane Roe") on July 24, 2017. Defendants include the University and the Board of Regents, plus four UNL employees who are each sued in their individual and official capacities: (1) Jake Johnson, Assistant Vice Chancellor for Student Affairs; (2) Laurie Bellows, Interim Vice Chancellor of Student Affairs; (3) Meagan Counley, Deputy Title IX Coordinator and Investigator; and (4) Toni Anaya, Associate Professor and Chair of the University Student Conduct Board.

The Amended Complaint contains six counts or claims: Count I is a Title IX claim which is brought against UNL; Counts II through V are state-law claims (for breach of

contract, breach of good faith and fair dealing, estoppel, and review under the Nebraska Administrative Procedure Act) which are brought against UNL and the Board of Regents; and Count VI is a § 1983 claim which is brought against the four UNL employees for alleged violations of Plaintiff's procedural and substantive due process rights. Count VI is the only claim that is challenged by Defendants' pending motion.[1]

In Count VI, Plaintiff alleges he "had a constitutionally protected property interest in his status as a student at UNL" and was deprived of this right "without being afforded the minimum level of due process required in the conduct of the investigation, administrative hearing, and subsequent appeal to UNL." (Filing No. 25, ¶¶ 205-08.) It is further alleged that "Defendants Johnson, Counley, Anaya, and Bellows acted under color of state law, and knew or reasonably should have known, that Plaintiff would be deprived of his rights under the Fourteenth Amendment and § 1983 when they acted arbitrarily and without a rational basis, thus denying Plaintiff his right to substantive due process." (*Ibid.*, ¶ 209.) For relief, Plaintiff requests monetary damages and reinstatement as a student at UNL. (*Ibid.*, p. 41.)

## II. SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).

In ruling on a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *See Dancy v. Hyster Co.*, 127 F.3d 649, 652-53 (8th Cir. 1997). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines whether there is evidence creating a genuine issue for trial. *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

---

[1] UNL argues it is not a proper defendant in this action because it does not have the capacity to sue or be sued, *see* Neb. Rev. Stat. § 85-105, but this issue has not been properly raised by the motion for partial summary judgment.

2

The moving party bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the moving party believes show the lack of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the moving party does so, the burden then shifts to the nonmoving party, who "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted. *Smith-Bunge v. Wisconsin Cent., Ltd.,* 946 F.3d 420, 424 (8th Cir. 2019).

## III. SUMMARY JUDGMENT PROCEDURE

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

This court's local rules further specify that "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts," which "should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a) (underlining in original). "The statement must not contain legal conclusions." *Id.* The opposing party's brief must include "a concise response to the moving party's statement of material facts." NECivR 56.1(b)(1). "Each material fact in the response must be set forth in a separate numbered paragraph, must include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, and, if applicable, must state the number of the paragraph in the movant's statement of material facts that is disputed." *Id.* The moving

party may, but is not required, to reply to the opposing party's response. *See Metro. Prop. & Cas. Ins. Co. v. Westport Ins. Corp.*, 131 F. Supp. 3d 888, 892 n. 2 (D. Neb. 2015).

A party's failure to comply with these requirements can have serious consequences: The moving party's "[f]ailure to submit a statement of facts" or "[f]ailure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion for summary judgment." NECivR 56.1(1)(a) (underlining omitted). On the other hand, "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(1)(b)(1) (underlining omitted).

## IV. EVIDENCE PRESENTED

In this case, Defendants' brief in support of their motion for partial summary judgment contains a separate, 153-paragraph statement of material facts with proper references to the record. (Filing No. 41, pp. 4-38.) Defendants have also filed the following evidentiary materials:

- Affidavit of Lily Amare (Filing No. 41-1), with attachments:
  - Exhibit A (Filing No. 41-2): Excerpts from the Transcript of recording of the pre-hearing conference held on May 16, 2018 ("Ex. A, May 16 Transcript")
  - Exhibit B (Filing No. 41-3): Transcript of recording of the pre-hearing conference held on May 25, 2018 ("Ex. B, May 25 Transcript")
  - Exhibit C (Filing No. 41-4): Transcript of recording of the hearing held on May 31, 2018 ("Ex. C, May 31 Transcript")
  - Exhibit D (Filing No. 41-5): Transcript of a recording of a telephone conversation between Plaintiff and Jane Roe ("Ex. D, Phone Transcript")

- Affidavit of Megan Counley (Filing No. 41-6), with attachments:
  - Exhibit E (Filing No. 41-7): Student Code of Conduct ("Ex. E, Student Code of Conduct")
  - Exhibit F (Filing No. 41-8): November 28, 2017 Letter from Counley to Jane Roe ("Ex. F, November 28 Letter")
  - Exhibit G (Filing No. 41-9): December 21, 2017 Letter from Counley to Plaintiff ("Ex. G, December 21 Letter")
  - Exhibit H (Filing No. 41-10): January 8, 2018 Letter from Counley to Plaintiff ("Ex. H, January 8 Letter")
  - Exhibit I (Filing No. 41-11): Investigation Report ("Ex. I, Investigation Report")

- o Exhibit J (Filing No. 41-12): January 8, 2018 Email between Plaintiff and Counley ("Ex. J, January 8 Email")
- o Exhibit K (Filing No. 41-13): April 6, 2018 Letter from Counley to Plaintiff (Ex. K, April 6 Letter)

- Affidavit of Jake Johnson (Filing No. 42-1), with attachments:
  - o Exhibit L (Filing No. 42-2): April 23, 2018 Email Exchange between Johnson and Plaintiff ("Ex. L, April 23 Letter")
  - o Exhibit M (Filing No. 42-3): April 24, 2018 Email from Johnson to Plaintiff ("Ex. M, April 24 Email")
  - o Exhibit N (Filing No. 42-4): April 26, 2018 Email Communication between Johnson and Plaintiff ("Ex. N, April 26 Email")
  - o Exhibit O (Filing No. 42-5): May 8-24, 2018 Email Communication between Johnson, Plaintiff and Plaintiff's Counsel ("Ex. O, May 8-24 Emails")
  - o Exhibit P (Filing No. 42-6): May 16, 2018 Inspection and Review by Plaintiff ("Ex. P, May 16 Inspection of Documents")
  - o Exhibit Q (Filing Nos. 43-1, 44-1): Unreacted Hearing Packet ("Ex. Q, Unredacted Hearing Packet")
  - o Exhibit R (Filing No. 45-1): Redacted Hearing Packet ("Ex. R, Redacted Hearing Packet")
  - o Exhibit S (Filing No. 45-2): May 29, 2018 Email regarding Review ("Ex. S, May 29 Email")
  - o Exhibit T (Filing No. 45-3): May 30, 2018 Email Exchange between Johnson and Plaintiff ("Ex. T, May 30 Email")
  - o Exhibit U (Filing No. 45-4): June 6, 2018 Letter regarding Findings of Conduct Board ("Ex. U, June 6 Decision Letter")
  - o Exhibit V (Filing No. 45-5): June 15, 2018 Appeal Letter ("Ex. V, Appeal Letter")
  - o Exhibit W (Filing No. 45-6): Laurie Bellows Appointment ("Ex. W, Appointment Letter')
  - o Exhibit X (Filing No. 45-7): July 26, 2018 Decision regarding Plaintiff's Appeal ("Ex. W, Final Decision")

Plaintiff has responded appropriately to Defendants' statement of material facts in his opposing brief (Filing No. 55, pp. 1-12) and has filed his own affidavit (Plaintiff's Exhibit A), in which he states:

> 1. I am over 18 years of age and am competent in all respects to make this affidavit.

> 2. I am the Plaintiff in the above captioned matter.

> 3. The facts contained herein are based upon my personal knowledge.

4. On or about January 8, 2018, I met with Meagan Counley regarding the University of Nebraska's investigation of alleged sexual misconduct against me. During this meeting I reported to Ms. Counley that [Jane Roe] on numerous occasions made sexual contact with me without my consent and had physically battered me. Upon information and belief, Ms. Counley never opened an investigation regarding the information I reported to her.

5. During my meeting with Ms. Counley, I requested that Ms. Counley investigate [Jane Roe's] medical and mental health history, and her academic history. Upon information and belief, Ms. Counley never investigated [Jane Roe's] medical and mental health history, or her academic history.

6. On July 24, 2017, I had consensual sex with [Jane Roe] at her off-campus apartment. I told Ms. Counley this during our meeting.

7. On July 24, 2017, [Jane Roe] did not push me away or say "no" when I attempted to have sex with her. I told Ms. Counley this during our meeting.

8. During the July 24, 2017 sexual encounter with [Jan Roe], [she] was a willing participant, and she manually stimulated herself during intercourse. I told Ms. Counley this during our meeting.

(Filing No. 55, pp. 25-26.)

For the most part, Defendants' statement of material facts is uncontroverted.[2] Plaintiff does take exception to several paragraphs of Defendant's statement which lacked citations to the record (paragraphs 20, 26, 71, and 89) or which contained incorrect citations (paragraphs 58, 84, 86, 105, 106, 107, 129, 149, and 150). Defendants have provided proper citations in their reply brief (Filing No. 56, p. 3), and the court has incorporated these additions and corrections into the statement of undisputed facts which follows. There is no indication Plaintiff has been prejudiced by the omissions or erroneous citations. Plaintiff's substantive disputes with other paragraphs of Defendants' statement (paragraphs 14, 32, 35, 40, 45, 46, 56, 57, 59, 64, 81, 85, 93, 94, 96, 111, 118, 119, 120, 121, 124, 127, and 147) will be noted below and addressed in context.

---

[2] Plaintiff has designated paragraphs 1-13, 15-19, 21-25, 27-31, 33, 34, 36-39, 41-44, 47-55, 60-63, 65-70, 72-80, 82, 83, 87, 88, 90-92, 95, 97-104, 108-110, 112-117, 122, 123, 125, 126, 128, 130-146, 148, and 151-154 as being "uncontroverted."

# V. STATEMENT OF FACTS

The court finds there is no genuine dispute regarding the following facts, which were set out in Defendants' brief.

## A. The Parties[3]

1. At all times relevant to this action, Plaintiff was a resident of Lancaster County, Lincoln, Nebraska. *[Filing No. 25, ¶ 9]*.

2. From January of 2015 until his expulsion, Plaintiff was a Ph.D. student in the Political Science Department at the University of Nebraska–Lincoln, and is a practicing and licensed attorney. *[Counley Affidavit, ¶ 6]*.

3. From August of 2015 through May of 2018, Jane Roe was a Ph.D. student in the Political Science Department at the University of Nebraska–Lincoln. *[Counley Affidavit, ¶ 5]*.

4. Defendant University of Nebraska–Lincoln ("University"), created by NEB. REV. STAT. 85-102.01, is a public educational institution, providing leadership in education and research, and is located in Lincoln, Nebraska. *[Filing No. 25, ¶ 10; Filing No. 28, ¶ 10]*.

5. Defendant Board of Regents for the University of Nebraska ("BRUN") is a board with constitutional responsibility for the general government of University of Nebraska–Lincoln, and consists of 8 voting members elected for six-year terms. *[Filing No. 25, ¶ 11; Filing No. 28, ¶ 11]. See also* NEB. CONST ART. VII, §10; NEB. REV. STAT. §§ 85-103, 103.02, 104, and 105.

6. Defendant Jake Johnson, J.D. ("Johnson") is the Assistant Vice Chancellor for Student Affairs at the University. *[Filing No. 25, ¶ 12; Filing No. 28, ¶ 12]*.

7. Defendant Laurie Bellows, Ph.D ("Bellows") is the Interim Vice Chancellor of Student Affairs at the University. *[Filing No. 25, ¶ 13; Filing No. 28, ¶ 13]*.

8. Defendant Meagan Counley ("Counley") was the Deputy Title IX Coordinator and Investigator at the University at all times relevant to this action. *[Filing No. 25, ¶ 14; Filing No. 28, ¶ 14]*.

9. Defendant Toni Anaya ("Anaya") is the Interim User Experience Coordinator and Associate Professor at the University and served as Chair of the University Student Conduct Board, during the Conduct Board hearing in this matter. *[Filing No. 25, ¶ 15; Filing No. 28, ¶ 15]*.

---

[3] The court does not consider headings as part of the statement of material facts under Nebraska Civil Rule 56.1.

### B. Applicable Provisions from the University's Student Code of Conduct

10. The University of Nebraska–Lincoln adopted a Student Code of Conduct, in order to: "(1) promote a campus environment that supports its educational, research, and outreach missions; (2) protect the members of the community and its resources from disruption and harm; (3) provide a guide to appropriate individual and group behavior; and (4) foster ethical standards and civic virtues…" *[Ex. E, Student Code of Conduct, Preamble].*

> This Student Code of Conduct applies to conduct that occurs on University premises and off University premises if the conduct is determined by the Dean of Students to adversely affect the University community, its members, its reputations or the pursuit of its objectives. *[Ex. E, Student Code of Conduct, Art. III. A. 1].*

11. Further, the Student Code of Conduct "applies to student conduct which occurs from the time of enrollment through the actual awarding of a degree, even if the conduct occurs prior to the start of classes or is discovered after a degree is awarded." *[Ex. E, Student Code of Conduct, Art. III. A.2].*

13.[4] The University of Nebraska investigates and addresses sexual misconduct, including sexual assault, sexual violence, dating violence, domestic violence, or stalking, in accordance with the Nebraska and Federal law as set forth in the "University of Nebraska–Lincoln Response to Allegations of Student Sexual Conduct," adopted pursuant to Board of Regents Policy 5.3.3., attached to the Student Code, as Appendix "A," or as "Appendix "A" may be hereafter amended. *[Ex. E, Student Code of Conduct, Preamble].*

14. Once the University receives a complaint or report of sexual misconduct (defined in Student Code of Conduct, App. A, § 1b), the Title IX Coordinator begins the investigation to determine if the allegations have merit, and shall conclude such investigation within (60) calendar days of receipt of a report. *[Student Code of Conduct, App. A, § 2d].* The Title IX Coordinator "may be permitted a longer completion period under extraordinary circumstances, but both parties must be informed in writing of the extension of the timeline." *[Ex. E, Student Code of Conduct, App. A, § 2d].* Upon completion of the investigation: If the investigator determines by the greater weight of the evidence that a violation occurred, a recommended disposition should be included in the investigator's report. If the investigation determines it is more likely than not that the

---

[4] Defendants' statement of material facts does not contain a paragraph 12.

Respondent did not violate the Student Code, the complaint may be dismissed without further proceedings. *[Ex. E, Student Code of Conduct, App. A, § 2d].*[5]

15. "The determination of the merits of each case shall be made using a greater weight of the evidence standard, meaning it is more likely than not that a proposition (such as violation of the Code) was proven." "The burden of proof . . . rest[s] upon the Conduct Officer or Complainant bringing the misconduct charge." "A Respondent is presumed not to be in violation of the Code until proven otherwise." *[Ex. E, Student Code of Conduct, App. A, § 4f & 4g.]*

16. In relevant part, the University provides the following rights to the Complainant and the Respondent in Sexual Misconduct Proceedings:

- Right for the investigation to be conducted by a trained University official to provide a prompt, fair, and impartial process from initial investigation to the final result;
- Right for both Respondent and Complainant to see sexual misconduct charges in written form;
- All charges to be presented to Respondent and Complainant in written form within seven University business days after the investigation is complete;
- Right to prepare a written statement in advance of a formal hearing;
- Right to view each other's statement;
- Right to be assisted by any advisor they choose;
- Right to hear all evidence, present evidence, testify, and to hear and submit questions for witnesses during formal hearing;
- Right to pose direct questioning of the witnesses, with possibly limitation, and, specifically, the Conduct Officer or Chair of the Conduct Board may control questioning by requiring Respondents and Complainant to submit questions in writing to determine if questions are appropriate and Chair may pose questions to the witness;

---

[5] Plaintiff states he "reported sexual assault and it was not investigated. [Plaintiff's Ex. A, ¶ 4]." (Filing No. 55, p. 2.) This statement does not directly refute the quoted portions of the Student Code of Conduct. Also, while Plaintiff avers in his affidavit that he reported "[Jane Roe] on numerous occasions made sexual contact with me without my consent and had physically battered me," his further contention that the report was not investigated is made "upon information and belief." In other words, Plaintiff has no personal knowledge that an investigation did not take place. "Under Rule 56[(c)(4)], an affidavit filed in support of or opposition to a summary judgment motion must be based upon the personal knowledge of the affiant; information and belief is insufficient." *Camfield Tires, Inc. v. Michelin Tire Corp.,* 719 F.2d 1361, 1367 (8th Cir.1983); *see Schell v. Bluebird Media, LLC,* 787 F.3d 1179, 1187-88 (8th Cir. 2015) (an assumption is insufficient evidence at the summary judgment stage).

- Right to inspect all documents used as evidence and list of all witnesses for the formal hearing in advance of the hearing; and
- Right to be notified of decision rendered, including statement of any University sanction imposed together with the rationale for the decision. *[Ex. E, Student Code of Conduct, App. A, § 5a-5k].*

17. In formal hearings, in cases of alleged sexual misconduct, the University provides the following rights to the Respondent and the Complainant:

- Right to attend pre-hearing conference, to be held at least 2 days prior to the scheduled hearing, to discuss the issues and facts that will be presented at the hearing, to exchange information about witnesses likely to be called, answer procedural questions, and settle those matters which may be agreeably concluded;
- Right to be instructed about the use of past sexual behavior of the Complainant or past sexual assault by the Respondent as evidence at the hearing, and that, in most situations, evidence of the past sexual history of either the Respondent or the Complainant will not be admitted at the hearing except in very limited situations;
- Right to a hearing, not less than three not more than fourteen University business days after parties have been notified that the complaint was referred to the hearing (subject to extension at the discretion of the Conduct Officer);
- Right to a hearing to be held before a conduct Board composed of at least 3 members;
- For any real or perceived conflict of interest or bias to be resolved two University business days in advance of the hearing;
- The Respondent, Complainant, and Conduct Officer are responsible for presenting their respective cases to the Conduct Board;
- Right to hear all evidence, present evidence, testify, and to hear and question witnesses;
- Opportunity in advance to inspect documents and a list of witnesses for the hearing no less than two University business days in advance of the hearing. *[Ex. E, Student Code of Conduct, App. A, § 7].*

18. After the hearing concludes, "the Conduct Board shall determine by simple majority vote whether or not the University Suspension or University Expulsion is warranted. The decision of a presiding Conduct Board shall be based solely upon evidence introduced and received at the hearing…." *[Ex. E, Student Code of Conduct, App. A, § 7d].*

19. Within seven University business days following the conclusion of formal hearing proceedings, the presiding Conduct Board Chair or the Conduct Officer shall inform the Respondent, the Complainant, and the Title IX Coordinator, in writing, of its findings and of the sanction(s) imposed. *[Ex. E, Student Code of Conduct, App. A, § 7e].*

20. The respondent may appeal a decision reached after a formal hearing within seven University business days of delivery of the decisions to the parties involved in the formal hearing, for the following purposes:

i.  To determine whether the original hearing was conducted fairly in light of the charges and the evidence presented, and in conformity with prescribed procedures giving the complaining party a reasonably opportunity to prepare and present evidence that the Code was violated, and giving the Respondent a reasonable opportunity to prepare and to present a rebuttal of those allegations; and

ii.  To determine whether the sanction(s) imposed were appropriate. *[Ex. E, Student Code of Conduct, App. A, § 9a-9c].*

21. Such appeal:

Shall be limited to review of the record of the initial hearing and supporting documents unless the Appeals officer, after notice to the Complainant and Respondent, requests additional information from the presiding Conduct Officer, Chair of the Conduct Board, Complainant or Respondent…[and]

The Appeals Officer shall complete review of the appeal normally within fourteen (14) University business days after receipt of the record and any additional information, and shall promptly issue a written decision to the Respondent, the Complainant and the Conduct Officer. *[Ex. E, Student Code of Conduct, App. A, § 9a-9f].*

### C. Complaints/Reports of Sexual Misconduct Against Plaintiff

22. On or about November 3, 2017, Dona-Gene Barton contacted the Office of Institutional Equity and Compliance ("IEC") and reported several students came to her with concerns regarding inappropriate conduct by Plaintiff. *[Counley Affidavit, ¶ 10; Ex. I, Investigative Report].*

23. IEC is a department that serves as the Civil Rights office for the University and handles all matters that involve any form of discrimination and/or harassment based on a protected status and any form of sexual misconduct. In particular, IEC is responsible for enforcing Title IX and conducting investigations into Title IX complaints. *[Counley Affidavit, ¶ 11].*

24. On November 21, 2017, Jane Roe submitted a formal complaint with IEC against Plaintiff, alleging:

•  In March of 2016, Plaintiff sexually assaulted her in his home, while Jane Roe was incapacitated due to intoxication ("March 2016 allegation of sexual assault");

11

- In August of 2016, Plaintiff stroked her leg during a presentation given during orientation, which made her uncomfortable ("August 2016 allegation of sexual assault");
- In July of 2017, approximately 10 days prior to July 24, 2017, Plaintiff sexually assaulted Jane Roe in her apartment ("July 2017 allegation of sexual assault"); and
- On July 24, 2017, Plaintiff sexually assaulted her in her apartment ("July 24 allegation of sexual assault").

(Collectively referred to as "complaint"). *[Ex. F, November 21 Letter].*

25. Counley, who is trained to provide a prompt, fair, and impartial process from initial investigation to the final result, was assigned to investigate the complaint. *[Counley Affidavit, ¶ 4]*

26. Counley's duties as an investigator include interviewing witnesses, assessing witness credibility, collecting any other evidence, completing an investigation report that presents a recommendation as to a Respondent's responsibility and any potential sanction(s). *[Ex. I, Investigation Report].*

27. On November 28, 2017, Counley sent a letter to Jane Roe outlining Jane Roe's allegations against Plaintiff, and informing Jane Roe that the University had commenced an investigation into her complaint. *[Ex. F, November 21 Letter].*

28. On December 21, 2017, Counley sent a letter to Plaintiff notifying him of the multiple complaints/reports[6] of sexual misconduct allegations against him, and that the University had commenced a Title IX investigation into these allegations ("December 21 letter"). *[Ex. G, December 21 Letter].* In the December 21 letter, Counley advised that the alleged conduct may be in violation of the Student Code of Conduct, particularly Student Code of Conduct, Appendix A, §§ 10cc & 10ee, which make it a violation of Student Code of Conduct to engage in sexual assault and harassment, as defined therein. *[Ex. G, December 21 Letter].*

_____

[6] Defendants state in a footnote: "In addition to Jane Roe's allegations of sexual misconduct against Plaintiff, the University received two other reports of allegations of sexual misconduct against Plaintiff. *[Filing No. 25, ¶ 2; Filing No. 28, ¶ 2].*" Although Plaintiff designates paragraph 28 as "uncontroverted" and does not object to the footnoted statement, the court does not consider the footnote to be in compliance with Nebraska Civil Rule 56.1. *See, e.g., Randall v. Potter*, 366 F. Supp. 2d 120, 123 (D. Me. 2005) ("Local Rule 56 does not contemplate the use of footnotes in statements of material fact ...."); *Kuchenreuther v. Advanced Drainage Sys., Inc.*, No. C 12-3088-MWB, 2014 WL 414294, at *1 (N.D. Iowa Feb. 4, 2014) ("ADS did submit a 'Statement of Material Facts' ... that substantially complies with the applicable local rule, although it does include various factual allegations in an extended footnote.").

29. In the December 21 letter, Counley notified Plaintiff of his rights as a Respondent. Specifically, Counley provided him with a printed resource that advised Plaintiff of his rights and the University's responsibilities regarding complaints of sexual misconduct, directed him to the University website detailing the University's sexual misconduct complaint and investigation process, and provided Plaintiff with a link to the University Code of Conduct. *[Id.]*

30. In the December 21 letter, Counley notified Plaintiff of the resources available to him for support. Specifically, Counley advised:

> There are numerous resources where you may turn for support should you need it during our investigation and thereafter. We encourage you to utilize the following resources to the extent they may be helpful to you. A full list is available on our website at http://www.unl.edu/equity/getting-help.
>
> UNL Resources
> • University Health Center, Medical Clinic, 1500 U Street, (402) 472-5000
> • University Health Center, Counseling and Psychological Services, (402) 472-7450
> • Student Legal Services, (402) 472-3350
> • LGBTQA Resource Services, Director Pat Tetreault, (402) 472-1752 *[Id.]*

31. In the December 21 letter, Counley offered Plaintiff the opportunity to respond to the allegations asserted against him, including allowing him to provide documents or other evidence. *[Id.]*

32. On January 8, 2018, in accordance with Student Code of Conduct, App. A, § 2d, Counley informed both the Plaintiff and Jane Roe that the investigation would exceed sixty days in order to accommodate the requests of both Plaintiff and Jane Roe. *[Ex. H, January 8 Letter].[7]*

33. Specifically, as it relates to Plaintiff, Plaintiff requested the University provide additional time for him to consult with an attorney, which the University accommodated by granting his request for additional time. *[Id.]*

### D. The Investigation by Title IX Investigator Counley

34. From November 21, 2017 to April 6, 2018, Counley investigated the complaint filed by Jane Roe. *[Ex. I, Investigation Report].*

---

[7] Plaintiff states that "Defendants' Exhibit H makes no mention of Jane Roe." (Filing No. 55, p. 4.) Plaintiff is correct; the letter is only addressed to him. However, Counley avers in her affidavit that she also conveyed this information to Jane Roe on January 8, 2018. (Filing No. 41-6, p. 2, ¶ 15.)

35. Throughout Counley's investigation, Plaintiff was given opportunities to be heard/respond …, provide evidence in response to the allegations against him, and review and inspect documents within the possession of Counley. *[Statement of Undisputed Facts, ¶ 42, 48].[8]*

36. On November 20 and 21, 2017, Counley met with Jane Roe, and Jane Roe provided a detailed account of her allegations against Plaintiff. *[Counley Affidavit, ¶ 18; Ex. I, Investigation Report, pp. 1-3].*

37. On multiple occasions, Jane Roe provided information and documents in support of her complaint. *[Counley Affidavit, ¶ 19; Ex. I, Investigation Report, pp. 3-8].*

38. On January 3, 2018, Counley sent an email to Plaintiff asking him how he would like to proceed, to which he replied that he would have documents and a witness list for Counley after he met with an attorney. *[Counley Affidavit, ¶ 20; Ex. I, Investigation Report, pp. 9].*

39. On January 8, 2018, Plaintiff sent an email to Counley stating he was prepared to provide a response to Jane Roe's allegations of sexual misconduct, and requesting to review Counley's file before submitting his response. Counley responded, stating she would have the documents ready for his review at 2 p.m. the same day. *[Ex. J, January 8 Email].*

40. On January 9, 2016 [*sic*], Counley met with Plaintiff for approximately 2 hours and 35 minutes. At this meeting, Plaintiff:

- Was informed of the investigation process and his rights;
- Was provided the opportunity and did review and inspect statements and documents generated by Counley as part of her investigation into the allegations against Plaintiff;

---

[8] The court has excised the words "in a meaningful manner" after "heard/respond," as being argumentative and not directly supported by the evidence cited. Plaintiff denies he was "given opportunities to be heard/respond in a meaningful manner regarding Counley's investigation," and states: "Plaintiff requested that Jane Roe's medical and mental health records should be included; requested that Jane Roe's academic records should be included; and reported to Counley that Jane Roe had sexually assaulted him and battered him on prior occasions, none of which were investigated. [Plaintiff's Ex. A, ¶¶ 4, 5]." (Filing No. 55, p. 4.) Plaintiff states in his affidavit that he requested Counley "to investigate [Jane Roe's] medical and mental history, and her academic history." (Filing No. 55, p. 25, ¶ 5.) However, his claim that there was no investigation of these matters, or of the alleged sexual assault and battery, is only made "upon information and belief," which is insufficient for summary judgment purposes. *See* n. 2, *supra*.

14

- Was provided the opportunity and did respond to Jane Roe's allegation in detail, including the details Jane Roe recounted to Counley on November 21 and 22, 2017;
- Was provided the opportunity to provide any and all information that he thought was pertinent to the investigation; and
- Was provided the opportunity to and did provide questions he wanted Counley to ask of Jane Roe. *[Counley Affidavit, ¶ 22; Ex. I, Investigation Report, pp. 3-8].*[9]

41. On January 9, 2018, Plaintiff provided Counley a witness list. *[Counley Affidavit, ¶ 23].*

42. In January of 2018, Plaintiff provided Counley a 106-page response to Jane Roe's Complaint. *[Counley Affidavit, ¶ 23].*

43. On multiple occasions, Plaintiff provided Counley information and documents in response to Jane Roe's complaint and the other reports of sexual misconduct. *[Counley Affidavit, ¶ 25].*

44. On February 15, 2018, Counley met with Jane Roe, and Jane Roe provided additional information. In addition, Jane Roe was provided an opportunity to respond and did respond to Plaintiff's response to her complaint, including questions posed by Plaintiff. *[Counley Affidavit, ¶ 26; Ex. I, Investigation Report, pp. 3-8].*

45. On March 7 and 14, 2018, Counley met with Lincoln Police Department ("LPD") Investigator Matt Franken to review LPD's investigative file. At that time, Counley:

- Reviewed (and took a copy of) the transcript of an audio recording of a telephone call/conversation between Plaintiff and Jane Roe;
- Listened to the audio recordings of a telephone call/conversation between Plaintiff and Jane Roe; and
- Listened to the audio recording of the interviews with two witnesses. *[Counley Affidavit, ¶ 27; Ex. I, Investigation Report, pp. 7].*[10]

46. On March 15, 2018, Counley met with Plaintiff. At this meeting, Plaintiff:

---

[9] Plaintiff objects that "Defendants' citations … do not support Defendants' statement." (Filing No. 55, p. 4.) Plaintiff's objection is overruled. Paragraph 22 of Counley's affidavit supports Defendants' statement, with the exception that Counley says the meeting took place on January 9, 2018—not 2016.

[10] Plaintiff objects that Defendants' citation to 'Ex. I, Investigation Report, pp. 7' does not support Defendants' statement." (Filing No. 55, p. 4.) Plaintiff's objection is overruled. Although Plaintiff is correct about the citation to Exhibit I, paragraph 27 of Counley's affidavit does support Defendants' statement.

- Was provided an opportunity to and did review and inspect the documents Jane Roe submitted;
- Was provided an opportunity to and did respond to the additional information and documents submitted by Jane Roe;
- Was provided an opportunity to and did review a transcript of a recorded telephone conversation of Jane Roe and Plaintiff retrieved by Counley from the Lincoln Police Department; and
- Was provided an opportunity to and did respond to the information contained within the transcript of the recorded telephone conversation. *[Counley Affidavit, ¶ 28; Ex. I, Investigation Report, pp. 8].[11]*

47. In addition to gathering information and documents from Plaintiff and Jane Roe, Counley gathered information and documents from the witnesses identified by both Plaintiff and Jane Roe, and other individuals Counley discovered to have relevant information in regard to the complaint. *[Counley Affidavit, ¶ 29; Ex. I, Investigation Report, pp. 10-13, 15-40].*

48. Throughout her investigation, Counley considered and reviewed the information and documents discovered. *[Counley Affidavit, ¶ 30].*

49. On April 2, 2018, once she retrieved all evidence, finalized interviews and resolved credibility issues, Counley notified Plaintiff and Jane Roe she had completed her investigation and was reviewing the final draft of her report. She also notified Plaintiff that a determination would be sent to him by the end of the week. *[Counley Affidavit, ¶ 31].*

### E. Findings and Recommendation for Sanction

50. On April 6, 2018, Counley finalized and issued her investigation report and recommendation. *[Counley Affidavit, ¶ 31].*

51. On April 6, 2018, Counley notified both Plaintiff and Jane Roe of her decision in a letter dated April 6, 2018, which, in relevant part, outlined her findings and recommendation for discipline ("April 6 letter"). *[Ex. K, April 6 Letter].*

52. The April 6 letter was delivered to Plaintiff via email, to the email address Plaintiff used to communicate with Counley throughout the investigation period and provided in his written statement/response. *[Counley Affidavit, ¶ 33].*

---

[11] Plaintiff objects that Defendants' citation to 'Ex. I, Investigation Report, pp. 8' does not support Defendants' statement." (Filing No. 55, p. 4.) Plaintiff's objection is overruled. Although Plaintiff is correct about the citation to Exhibit I, paragraph 28 of Counley's affidavit does support Defendants' statement.

53. Regarding the March 2016 and July 2017 allegation of sexual assault, Counley concluded there was insufficient evidence to support either of the allegations. *[Ex. K, April 6 Letter].*

54. Regarding the August 2016 allegation of sexual harassment, Counley concluded the greater weight of the evidence supports that Plaintiff stroked Jane Roe's thigh in August of 2016, but found that it was not sufficiently severe or pervasive to create a hostile environment. *[Id.]*

55. Regarding the July 24 allegation of sexual misconduct, Counley concluded the greater weight of the evidence supports that Plaintiff sexually assaulted Jane Roe on July 24, 2017, and therefore, engaged in sexual misconduct, which is a violation of the Student Code of Conduct, App. A, § 10cc. Specifically, Counley explained:

> The greater weight of the evidence supports that you sexually assaulted [Jane Roe] on July 24, 2017 in [Jane Roe's] off campus apartment. Complainant 2 [Jane Roe] alleged she repeatedly told you no and pushed you away, but you penetrated [Jane Roe's] vagina with your fingers and penis, despite her lack of consent. You acknowledged in your written statement that [Jane Roe] stated she did not want to have sex because you had a girlfriend, and [Jane Roe] physically resisted you by grabbing your hand as you attempted to pull her underwear to the side. You reported you digitally penetrated [Jane Roe's] vagina, then engaged in vaginal intercourse. [Jane Roe's] version of events in which she expressed a verbal and physical lack of consent was supported by the recorded phone call and transcripts provided for review by the Lincoln Police Department. During the recorded call, you stated it was true that you were overcoming [Jane Roe's] objections, and you agreed that [Jane Roe] said no and pushed you away. As such, the greater weight of the evidence supports that you sexually assaulted [Jane Roe]. *[Ex. K, April 6 Letter].*

56. In the recorded telephone conversation between Plaintiff and Jane Roe—which Counley relied on to find the greater weight of the evidence shows Plaintiff sexually assaulted Jane Roe on July 24, 2017—Plaintiff … stated that he "overcame [Jane Roe's] objections" because he did not think Jane Roe was refusing him because she found him unattractive, but Roe's refusal was because Roe felt guilty because she believed Plaintiff was in a relationship with another woman. *[Ex. D, Phone Transcript].*[12]

---

[12] The court has excised Defendants' statement that during the conversation Plaintiff "admitted Jane Roe said 'no' multiple times and physically pushed him away when he attempted to have sex with her." The phone transcript does not fully support this statement. Plaintiff's objection is sustained. . The Conduct Board determined, however, that plaintiff admitted at 1:47:04 and at other points in the recorded conversation that Jane Roe did not give consent on July 24, 2017. *See* ¶¶ 135-136, 145 *infra.*

57. Plaintiff also admitted he sexually penetrated Jane Roe's vagina digitally and with his penis, …. *[Ex. D, Phone Transcript].*[13]

58. During the telephone conversation, Plaintiff stated:

- I mean it's true then, . . . I was overcoming your objections but it's also true, uhm your objections weren't like I don't find you attractive, I don't think of you that way, you were like well if you're in a relationship now forget it and I was trying to tell you that I didn't care that I wanted to be with you. *[Ex. D, Phone Transcript, 5:32-42].*

- [O]nce I put myself inside you, and you were pushing back hard against me, and then at that point I was so turned on that I just (inaudible) you know, like wow all of that for (inaudible) longest he could make it and then even were telling me to come back the next day, no I didn't-I feel like I had taken advantage of you, I felt like I had overcome your objection and sort of like assuage your guilty conscience but I didn't, you know, I didn't feel like I was abusing you. *[Ex. D, Phone Transcript, 6:4-10].*

- I'm really sorry, I didn't think that that would bother your control issues the way it did. *[Ex. D, Phone Transcript, 6:44-46].*

- I'm just saying my impression was you were saying you can't do it because, uh, Idally[14] is there and I don't want any guilt on my head, not, uhm, you gross me out, I don't find you attractive. *[Ex. D, Phone Transcript, 8:23-26].*

- [T]here's a huge distinction, I think in my mind, uhm, (inaudible) saying no, we can't cause I'll feel guilty about it verses, uhm, I said no and you are forcing me to do something I don't want to do. (To which, Jane Roe responds: "Uhm, well either way I'm saying no.") *[Ex. D, Phone Transcript, 8:34-36].*

- Okay. You said no, you're right. So that ends our discussion on that and you're right one and I'm always the wrong one and nothing has changed in our relationship and thanks for reminding me of that. *[Ex. D, Phone Transcript, 26:1-5].*

- You were saying no, I don't wanna do that to Idally and you were saying no you said mean things about Idally and that's how I think that you say things about me when I'm not there, but that's what you tell Idally about me when I'm not there. *[Ex. D, Phone Transcript, 27:10-13].*

- Honestly I couldn't control myself I guess, I just wanted to be with you and be inside you and show you that there was nobody else but you. *[Ex. D, Phone Transcript, 35:34-38].*

---

[13] The court has excised Defendants' statement that Plaintiff admitted the sexual penetration occurred "despite [Jane Roe's] clear verbal and physical communication to him that she did not want to engage in sexual activities with him." The phone transcript does not fully support this statement. Plaintiff's objection is sustained.

[14] Defendants state in a footnote that "Idally is the first name of a woman Roe believed John Doe was in a relationship with at the time of the July 24, 2017 incident."

- I don't—I didn't think you were saying no because you didn't want to, I assumed that you were saying no because you were feeling guilty and that if I, uhm, helped relieve some of your guilt about it by taking the lead on it, that, uhm, we would get past it I guess, I don't know. I mean…. *[Ex. D, Phone Transcript, 35:41-46]. [See also Ex. K, April 6 Letter].*

59. Based upon her finding, Counley recommended Plaintiff be expelled from the University, because the greater weight of the evidence shows that Plaintiff sexually assaulted Jane Roe by contact and penetration in violation of the Student Code of Conduct. *[Id.]*[15]

60. In the April 6 letter, Counley advised Plaintiff: "If you disagree with this finding, you have the option to request a hearing or administrative resolution. Requests for hearing or administrative resolution must be made within seven (7) University business days to the Vice Chancellor for Student Affairs." *[Id.]*

61. Furthermore, Counley advised Plaintiff of the various resources available to him. *[Id.]*

### F. Plaintiff's Untimely Request for a Hearing

62. Despite being informed he had seven days to appeal/request a hearing, Plaintiff did not request a hearing until April 23, 2018, claiming he did not receive the email sent to him on April 6, 2018. *[Johnson Affidavit, ¶ 4; Ex. L, April 23 Email].*

63. On April 24, 2018, Johnson, Assistant Vice Chancellor for Student Affairs— after forwarding the email sent to Plaintiff on April 6, 2018 with the April 6 letter attached—decided to accommodate/grant Plaintiff's request for a hearing, and encouraged Plaintiff to review Appendix A of the Student Code of Conduct to understand the nature of the hearing process. *[Johnson Affidavit, ¶ 5; Ex. M, April 24 Email].*

64. On April 26, 2018, Johnson informed Plaintiff that the University was in the process of scheduling a hearing before the University Conduct Board, and explained the University would need an additional 2 to 3 weeks to get a hearing date, time, and location confirmed, given the time of the year and the challenges faced finding concurrent availability for board members and support staff….. *[Johnson Affidavit, ¶ 6; Ex. N, April 26 Email].*[16]

---

[15] Plaintiff disputes "that the greater weight of the evidence shows that Plaintiff sexually assaulted Jane Roe." (Filing 55, p. 5.)

[16] The court has excised the last sentence of this paragraph because it is not supported by Johnson's affidavit or the cited exhibit. Plaintiff's objection is sustained.

65. On April 30, 2018, Johnson notified Plaintiff that the hearing would be held on May 23, 2018, and the pre-hearing conference would be held on May 16, 2018. *[Johnson Affidavit, ¶ 7]*. On May 8, 2018, Roger Moore, attorney for Plaintiff, requested the hearing be moved to the end of June. Johnson granted the request in part and agreed to continue the hearing to late May, 2018. Johnson advised that he had already permitted the hearing to be scheduled outside of the timeframe mandated by the Student Code of Conduct and BRUN bylaws. Johnson further noted that Doe had visited the IEC office multiple times to review the documents and speak with Counley. *[Ex. O, May 8-24 Email Exchanges] [Emphasis added]*. Again, on May 14, 2018, Johnson explained that while the hearing was originally set for April 24, 2018, Johnson had granted a continuance until May 23, 2018. Johnson advised the hearing would be held on May 31, 2018, but if that date could not be accommodated, he would consider moving the hearing to the week of June 4-8, 2018. He again noted that Doe had the opportunity to meet with the investigator and review evidence from January to April of 2018. *[Id.]*

66. Regarding the pre-hearing conference, Johnson advised Plaintiff and Mr. Moore that Jane Roe was scheduled to come meet with him, Counley and Toni Anaya on May 16, 2018 for a pre-hearing conference, and that "the same pre-hearing conference is available to you [Plaintiff] as well, but it sounds as though you may need a different time to accommodate your schedule." *[Id.]*

67. Johnson explained to Plaintiff and Mr. Moore: "The pre-hearing conference allows us to discuss the 'issues and facts that will be presented at the hearing, to exchange information about witnesses likely to be called, answer procedural questions, and settle those matters which may be agreeably concluded." (See Appendix A, Section 7)." *[Id.]*

68. Solely to accommodate Plaintiff's and Mr. Moore's schedule, a separate pre-hearing conference with Plaintiff was scheduled for May 25, 2018, and the hearing was moved to May 31, 2018. *[Johnson Affidavit, ¶ 9]*.

69. Plaintiff was provided the opportunity to review and inspect the entire hearing packet prior to the hearing. *[Johnson Affidavit, ¶ 10; Ex. P, May 16 Inspection of Documents]*. Plaintiff was advised: "The Student Code of Conduct, Appendix A, Section 5g, enables the parties participating in a formal hearing to hear all evidence, present evidence, testify, and submit questions for witnesses. To aid the parties in their efforts to prepare for formal hearings, the Office of Student Conduct and Community Standards ("SCCS") makes the evidence and information available prior to the hearing and allows the parties to review and inspect the submitted evidence." *[Id.]*

70. On May 16, 2018, Plaintiff and Mr. Moore did review and inspect the entire investigative file/hearing packet in preparation for the pre-hearing conference and the hearing. *[Id]*

20

71. The hearing packet Plaintiff and Mr. Moore reviewed included:

- Witness List—to which Plaintiff was privy;
- Investigation Report and Summary, approximately 56 pages—which included information and documents generated during the investigation period and which Plaintiff reviewed and inspected during the investigation period;
- LPD Transcript of the Telephone Call between Plaintiff and Jane Roe, approximately 25 pages—which Plaintiff reviewed and inspected during the investigation period;
- Jane Roe's evidence, approximately 101 pages (25 of which is transcript of the audio recording of the telephone conversation between Plaintiff and Jane Roe with minor notes of Jane Roe)—which Plaintiff reviewed and inspected during the investigation period; and
- Plaintiff's own evidence, approximately 344 pages—which were provided by Plaintiff during the investigation period, of which Plaintiff obviously had copies. *[Ex. Q, Unredacted Hearing Packet.]*

72. The following individuals were appointed to serve on the University Student Conduct Board: Toni Anaya, Chair; Anna Witt, Member; and Christian Robinson, Member. *[Johnson Affidavit, ¶ 13].*

### G. Pre-Hearing Conference with Plaintiff and Jane Roe

73. On May 16, 2018, a pre-hearing conference with Jane Roe was held, and the following individuals were in attendance: Jane Roe; Toni Anaya; Bren Chambers ("Chambers"), Associate General Counsel for the University; Elizabeth Govaerts, Counsel for Jane Roe; Morgan Beal, support person for Jane Roe from Voices of Hope; Johnson; Counley; and Brianna Sears, Title IX Investigator. *[Ex. A, May 16 Transcript Excerpt]*

74. In advance of the pre-hearing and hearing, upon Mr. Moore's question regarding the procedure that would be applied at the hearing and whether there would be live witnesses testifying and cross-examination allowed, Johnson explained to both Mr. Moore and Plaintiff:

The answer to your questions can be found in the policy (Appendix A, Section 7). I think the most informative parts are as follows:

Section 7c.vi: "The Respondent(s), the Complainant, and the Conduct Officer shall have the right to hear all evidence, present evidence, testify, and to hear and question witnesses." Live witnesses may testify. The University intends to have Ms. Counley, the IEC investigator, at the hearing to answer questions about her report. The University will have no other witnesses, and to my knowledge, the Complainant will

21

not be presenting witnesses. [Plaintiff] has not provided the names of witnesses he would call, so there should not be witnesses from the Respondent.

As for evidence that may be presented to the board, that will be the primary topic at the pre-hearing conference tomorrow.

To answer your question about cross-examination I would point you to Section 5g.i: "Direct questioning of the witnesses by the Respondent and Complainant may be limited. The conduct Officer presiding at the hearing or Chair of the Conduct Board may control questioning by requiring the Respondent and Complainant to submit questions in writing to determine if the questions are appropriate, and then the presiding Conduct Officer or Chair may pose questions to the witness." *[Ex. O, May 8-24 Emails].*

75. On May 25, 2018, a pre-hearing conference was held with Plaintiff for almost four (4) hours. ("May 25 conference"). *[Ex. B, May 25 Transcript].*

76. The May 25 conference was held in accordance with applicable Student Code of Conduct provisions. Particularly:

- It was held five University business days in advance of the hearing, in accordance with Student Code of Conduct, App. A, § 7a;
- During the May 25 conference, Plaintiff exercised his right to attend the conference to discuss the issues and facts that would be presented at the hearing, to exchange information about witnesses likely to be called, answer procedural questions, and settle those matters which may be agreeably concluded, in accordance with Student Code of Conduct, App. A, § 7a;
- Plaintiff was instructed about the use of past sexual behavior of Jane Roe as evidence at the hearing, in accordance with Student Code of Conduct, App. A, § 7a(i); and
- Anaya, as Chair of the Conduct Board, issued the final decision addressing procedural and evidentiary questions, in accordance with Student Code of Conduct, App. A, § 7c(ix). *[Ex. B, May 25 Transcript; Jonson Affidavit, ¶ 15].*

77. Plaintiff, Mr. Moore, Chambers, Johnson, Counley, and Anaya attended the May 25 pre-hearing conference. *[Ex. B, May 25 Transcript].*

78. Anaya presided over the conference, in order to address procedural and evidentiary questions/matters. *[Ex. B, May 25 Transcript].*

79. At the beginning of the pre-hearing conference, the University, through Johnson, explained to Plaintiff and Mr. Moore that the objective of the conference is to discuss issues and facts that will be presented at the hearing, to exchange information about witnesses likely to be called, answer procedural questions, and settle those matters which may be

agreeably concluded, in accordance with 7a of the Student Code of Conduct. *[Ex. B at 3:40-49].*

80. The University proposed to narrow the issues to whether Plaintiff sexually assaulted Jane Roe on July 24, 2017, because Plaintiff was appealing the finding that Plaintiff engaged in sexual misconduct in violation of the Student Code of Conduct as a result of Counley finding that the greater weight of the evidence supported that Plaintiff sexually assaulted Jane Roe on July 24, 2017. *[Ex. B at 5:21].*

81. After some discussion, Plaintiff agreed the ultimate issue for the hearing before the Conduct Board was whether Plaintiff sexually assaulted Jane Roe on July 24, 2017. *[Ex. B at 6:44-7:14].*[17]

82. After Plaintiff and Mr. Moore affirmed that they had reviewed the entire investigative file on May 16, 2018 *[Ex. B at 3: 40-49]*, the parties—the University and the Plaintiff—discussed the contents of the hearing packet (Ex. Q, Unredacted Hearing Packet) and presented their respective positions as to which of the documents contained in the hearing packet were relevant to be presented to the Conduct Board to determine the ultimate issue of whether Plaintiff sexually assaulted Jane Roe on July 24, 2017. *[Ex. B, May 25 Transcript].*

83. What will be accepted as evidence for consideration by the presiding Conduct Board is governed by Student Code of Conduct, App. A, § 7c(viii) [& (ix)], which provides:

> Pertinent records, facts, reports, and statements may be accepted as evidence for consideration by a presiding Conduct Officer or Conduct Board. Evidence which possesses probative value commonly accepted by reasonably prudent persons in the conduct of their affairs may be admitted and given probative effect. Incompetent, irrelevant, immaterial, and unduly repetitious evidence should be excluded. The rules of privilege recognized by law shall be given effect. Evidence that would not be admissible in a State Court criminal proceedings by reason of the method or manner in which it was acquired shall not be admitted.

> All procedural and evidentiary questions are subject to the final decision of the presiding Conduct Officer or Chair of the Conduct Board. *[Ex. E at 21].*[18]

84. In accordance with Student Code of Conduct, App. A, §7c(viii), starting with the University's proposed exhibits, the University proposed to redact the University's

---

[17] Plaintiff states he "agreed that there was one issue that was appealed by him. However, Plaintiff objected to the exclusion of evidence regarding the several other allegations by Jane Roe, which were found to be unsubstantiated by Investigator Meagan Counley. [Defendants' Ex. B, 6:44-7:14]." (Filing No. 55, p. 7).

[18] Citations added by the court, although paragraph not controverted by Plaintiff.

evidence, specifically the investigative report, in order to focus on facts germane to addressing the ultimate issue, which was whether Plaintiff sexually assaulted Jane Roe on July 24, 2017. *[Ex. B at 16:13]*.

85. After some discussion, Plaintiff stated: "I don't fundamentally object to anything that the University wants in, as far as their material. I don't object to the extent that it's being redacted." *[Ex. B at 26:7-11]*.[19]

86. Then, the University and Plaintiff began discussing which of the exhibits Plaintiff was proposing should be accepted as evidence for consideration by the Conduct Board. *[Ex. B at 26:19-31]*.

87. University and the Plaintiff disagreed regarding some of the documents Plaintiff proposed to present as evidence to the Conduct Board. *[Ex. B, 27-56]*.

88. Both Plaintiff and University were given the opportunity to present their position regarding the proffered evidence/exhibits, and the ultimate decision (admitted or excluded) was made by Anaya. *[Id.]*

89. Specifically, Anaya applied redactions or exclusions to the exhibits/evidence Plaintiff proposed to use as evidence/exhibits at the hearing. In summary, from his written response, Anaya redacted:

- Legal analysis applicable to Title VII cases *[Ex. Q, Unredacted Hearing Packet, pp. 235; Ex. R, Redacted Hearing Packet, pp. 157]*;
- Information regarding Plaintiff's experience representing individuals with Title VII cases, including sexual harassment *[Ex. Q, Unredacted Hearing Packet, pp. 235-236; Ex. R, Redacted Hearing Packet, pp. 157-158]*;
- Plaintiff's personal opinion of Jane Roe's alleged mental disorder(s), medication, his personal feelings toward her at the time of the hearing, her alleged suicidal ideation and alleged suicide attempts *[Ex. Q, Unredacted Hearing Packet, pp. 237-41; Ex. R, Redacted Hearing Packet, pp. 159-63]*;
- Jane Roe's parents' history with psychiatric disorders *[Ex. Q, Unredacted Hearing Packet, pp. 241; Ex. R, Redacted Hearing Packet, pp. 163]*;
- Jane Roe's interaction with the other individual who submitted a claim against him *[Ex. Q, Unredacted Hearing Packet, pp. 258; Ex. R, Redacted Hearing Packet, pp. 180]*;

---

[19] Plaintiff objects that "[t]he quotation cited by Defendants is inaccurate and taken out of context. The transcript actually shows that Plaintiff stated, 'I've said I don't I don't fundamentally object to uh anything that the University wants in as far as their material I don't object to the extent that's [sic] its [sic] being redacted in the course of discussing it it seems the University is intent on trying to muzzle me…'" [Defendants' Ex. B at 26:7-10]." (Filing No. 55, p. 7) Plaintiff's objection is sustained pursuant to the "rule of completeness." *See* Fed. R. Evid. 106.

- Narrative of how their relationship started, what he loved about her, how she presented herself when they first met, and other incidents that occurred during their relationship *[Ex. Q, Unredacted Hearing Packet, pp. 239, 254; Ex. R, Redacted Hearing Packet, pp. 161, 176];*
- Why he was so sympathetic of Jane Roe *[Ex. Q, Unredacted Hearing Packet, pp. 240; Ex. R, Redacted Hearing Packet, pp. 162];*
- Jane Roe's financial issues and how he helped her *[Ex. Q, Unredacted Hearing Packet, pp. 240; Ex. R, Redacted Hearing Packet, pp. 162];*
- Jane Roe's use of prescription drugs, marijuana and alcohol *[Ex. Q, Unredacted Hearing Packet, pp. 240, 251, 262, 264; Ex. R, Redacted Hearing Packet, pp. 162, 173, 184, 186];*
- His shortcomings and possible mental conditions: such as his fear of public speech, performance anxiety, and anxiety *[Ex. Q, Unredacted Hearing Packet, pp. 240; Ex. R, Redacted Hearing Packet, pp. 162];*
- Information related to Plaintiff's and Jane Roe's sexual activities, prior to July 24, 2017 that Anaya deemed to be unrelated to the July 24, 2017 sexual assault allegation:
  - That he bought and shipped a vibrator to her *[Ex. Q, Unredacted Hearing Packet, pp. 237; Ex. R, Redacted Hearing Packet, pp. 159];*
  - That he went with her to buy a vibrator based on her complaints of sexual frustration *[Ex. Q, Unredacted Hearing Packet, pp. 258; Ex. R, Redacted Hearing Packet, pp. 180];*
  - That she masturbated and touched herself during their sexual encounter; *[Ex. Q, Unredacted Hearing Packet, pp. 237; Ex. R, Redacted Hearing Packet, pp. 159]*
  - That she had originally just intended to use him as a random hookup *[Ex. Q, Unredacted Hearing Packet, pp. 251; May 31 Hearing Pac Ex. R, Redacted Hearing Packet ket, pp. 173];*
  - How they had an active sex life and that she sent him nude photos in prior times *[Ex. Q, Unredacted Hearing Packet, pp. 252; Ex. R, Redacted Hearing Packet, pp. 174];*
  - Other sexual activities they engaged in, including details *[Ex. Q, Unredacted Hearing Packet, pp. 266; Ex. R, Redacted Hearing Packet, pp. 188];*
- Information related to other incidents during their relationship, prior to July 24, 2017 that Anaya deemed unrelated to the July 24, 2017 sexual assault allegation:
  - That she called the police on him for trespassing and stealing her gun, why he thinks she called the police, and other information related to the gun and permission to enter her home *[Ex. Q, Unredacted Hearing Packet, pp. 237, 243-46, 271; Ex. R, Redacted Hearing Packet, pp. 159, 166-68, 193];*
  - That she has refused to leave his home in the past *[Ex. Q, Unredacted Hearing Packet, pp. 242; Ex. R, Redacted Hearing Packet, pp. 164];*
  - That they have had a physical altercation in the past *[Ex. Q, Unredacted Hearing Packet, pp. 242; Ex. R, Redacted Hearing Packet, pp. 164]*

25

- How she had issues with her landlord, and how he helped *[Ex. Q, Unredacted Hearing Packet, pp. 246; Ex. R, Redacted Hearing Packet, pp. 165]*
- That Jane Roe was jealous of him and the conversations he has had with Jane Roe regarding his interaction and relationship with other women *[May 25 hearing packet Ex. Q, Unredacted Hearing Packet, pp. 249; Ex. R, Redacted Hearing Packet, pp. 171]*
- Burning down of his house/barn *[Ex. Q, Unredacted Hearing Packet, pp. 265; Ex. R, Redacted Hearing Packet, pp. 187];*
- Other miscellaneous events *[Ex. Q, Unredacted Hearing Packet, pp. 259, 303-05; Ex. R, Redacted Hearing Packet, pp. 181, 220-22];*

- Comparing Jane Roe's prior sexual assault claim against another man (which occurred years prior) to the sexual assault allegation made against him *[Ex. Q, Unredacted Hearing Packet, pp. 237, 269; Ex. R, Redacted Hearing Packet, pp. 159, 191];*
- Information about the remaining allegations, other than the July 24, incident, including information regarding the allegations put forth by the other students *[Ex. Q, Unredacted Hearing Packet, pp. 276-79; Ex. R, Redacted Hearing Packet, pp. 198-201];*
- His theory as to why Jane Roe filed a complaint against him *[Ex. Q, Unredacted Hearing Packet, pp. 279-80; Ex. R, Redacted Hearing Packet, pp. 201-202];* and
- Timeline of events starting August 1971 to April 29, 2016, and May 23, 2016-July 23, 2017, with information Anaya deemed wholly unrelated to the July 24, 2017 sexual assault allegation *[Ex. Q, Unredacted Hearing Packet, pp. 292-337; Ex. R, Redacted Hearing Packet, pp. 209-254].*

90. After addressing all of Plaintiff's proposed exhibits, the University identified its witness—investigator Megan Counley. *[Ex. B at 58:31-39].*

91. Thereafter, Plaintiff and the University went through the evidence Jane Roe planned on introducing, giving Plaintiff the opportunity to address each of her proposed exhibits, including making any objections. *[Ex. B at 59:31-70:21].*

92. At no time during this pre-hearing conference was Plaintiff told he could not call Jane Roe as a witness or submit questions to her at the hearing. *[Ex. B].*

### H. Opportunity to Review Finalized Hearing Packet Prior to the May 31, 2018 Hearing and Communication Regarding Re-Scheduling the May 31 Hearing

93. On May 29, 2018, Plaintiff was notified that the finalized Hearing Packet was ready for his review. Specifically, he was informed that he could review the packet on May 29 and 30, 2018, from 9:00 a.m. to 4:00 p.m. *[Ex. S, May 29 Email].*[20]

---

[20] The court has made a date correction in accordance with Plaintiff's objection, which is sustained.

94. Plaintiff informed the University that he would review the documents on May 30, 2018 at 1:30 pm. *[Id.]*[21]

95. Further, the final hearing packet was made available to all of the members of the Conduct Board, and they reviewed the hearing packet. *[Johnson Affidavit, ¶ 17].*

96. On May 30, 2018, Jake Johnson notified Plaintiff that Roe declined Plaintiff's offer to settle the matter through an administrative resolution, and that the hearing that was scheduled for May 31 was being postponed. Plaintiff and his attorney objected to the continuance, …. *[Ex. T, May 30 Email].*[22]

97. Jake Johnson responded: "given your concerns about scheduling we will proceed with the hearing tomorrow morning as planned." *[Id.]*

### I. May 31 Hearing Before the Conduct Board

98. On May 31, 2018, a hearing was held before the Conduct Board ("May 31 hearing"). *[Ex. C, May 31 Transcript].*

99. The May 31 hearing lasted approximately 3 hours and 15 minutes, and the following individuals were in attendance: Anaya, Chair of the Conduct Board; Christian Robinson, Member, Conduct Board; Anna Witte, Conduct Board Member; Bren Chambers; Jake Johnson, Student Conduct Officer representing the University; Plaintiff; Roger Moore, Attorney/Advisor for Plaintiff; and Jane Roe. *[Ex. C, May 31 Transcript at 1:13-2:8].*

100. At the beginning of the hearing, Plaintiff objected to the proceeding on jurisdictional grounds and on due process grounds. Plaintiff also objected on the doctrine of spoliation. Further, Plaintiff asserted he intended to make an offer of proof to discuss relevant evidence. *[Ex. C, May 31 Transcript at 2:28-38].*

101. Upon Plaintiff's request, the Conduct Board provided Plaintiff the opportunity to be heard and to further explain his objections. *[Ex. C, May 31 Transcript at 2:39-48].*

102. The issue of offer of proof was put on hold until the end of the hearing. *[Ex. C, May 31 Transcript at 4:8-42].*

103. Thereafter, Anaya, Chair, provided the procedures that would be followed during the hearing. Specifically, Anaya provided:

---

[21] The court has made a date correction in accordance with Plaintiff's objection, which is sustained.

[22] The court has excised Defendants' statement that Plaintiff and his attorney objected to the continuance because "they had rearranged their schedules and had spent hours reviewing information." The cited exhibit does not support this statement. Plaintiff's objection is sustained.

- The hearing will be conducted in accordance with the Student Code of Conduct;
- The University Conduct Board is not a court of law, and therefore, is not bound by the strict rules of evidence and procedures prescribed for the civil and criminal courts;
- The hearing before the Conduct Board will permit the Board and the participants to discuss the issues and examine relevant facts surrounding the complaint that has been made; and
- That the procedures are designed to assure all parties in the case have an opportunity to present their respective positions. *[Ex. C, May 31 Transcript at 4:42-5:13].*

104. Johnson read the complaint which alleged Doe violated Appendix A, section 10cc Code by committing a sexual assault of Jane Roe on July 24, 2017.
*[Ex. C, May 31 Transcript at 5: 15-24].*

105. Plaintiff denied responsibility for the violation stated by Johnson. *[Ex. C at 5:25-28].*

106. Then, Anaya continued with explaining the procedure to be followed at the hearing and rights of Plaintiff, Jane Roe and the University. *[Ex. C at 5:30-6:18.]*

107. Regarding the procedure, Anaya, in relevant part, instructed:

- *First*: The Conduct Board will deal with whether the alleged behavior occurred and violated the Student Code of Conduct;
- *Second*: the Conduct Board will move to closed session and deliberate regarding the testimony and facts before it;
- *Third*: The Board will announce its findings, and if the board finds a violation, the parties will be given an opportunity to provide recommendations as to what appropriate sanctions should be imposed; and
- *Fourth*: the Conduct Board will move to closed session and deliberate and determine the appropriate sanction. *[Ex. C at 5:30-39].*

108. Regarding the evidence that will be considered, Anaya, in relevant part, instructed:

- Discussions should focus only on the charge included in the complaint presented by Johnson, and that because there were no findings on two of the charges listed in the official University correspondence, all information regarding those charges have been redacted from the record;
- Discussion of previous sexual history of both the complainant and the respondent should not be introduced except to the extent directly relevant to the parties' course of conduct during the incident in question and is not unduly prejudicial to either party; and
- Any discussion or speculation regarding the mental health of either party should not be introduced unless it is directly related to any concerns or interactions that informed responses of the participants. *[Ex. C, May 31 Transcript at 5:31-6:18].*

28

109. Regarding presentation of evidence, Anaya, in relevant part, instructed:

- The Conduct Officer, Johnson, will be allowed to make an opening statement, and present his evidence and witnesses;
- Following each of Johnson's witnesses, Plaintiff and Jane Roe will be given an opportunity to cross-examine the witnesses;
- Plaintiff may then make opening statement and "offer the testimony of any witnesses that are in attendance today";
- Following each of Plaintiff's witnesses, Johnson and Jane Roe will be given an opportunity to cross-examine the witness;
- Members of the Conduct board may ask additional questions of the witnesses to seek clarification; and
- Each of the participants were given the following timeline: opening statement, 15 minutes; offering of non-witness evidence will be limited to 40 minutes unless leave for additional time is granted. *[Id].*

110. Thereafter, the University presented its case. *[Ex. C, May 31 Transcript at 6:45-20:45].*

111. In the presentation of the University's case, Johnson, representing the University, first made an opening statement, …. *[Ex. C, May 31 Transcript at 7:4-8:8].*[23]

112. Then, Johnson called its witness, Counley, and began its direct examination. *[Ex. C, May 31 Transcript [Amare Aff., Ex. E at 8:4-8:8].*

113. Johnson asked Counley "if she found as a fact the respondent sexually penetrated the complainant on July 24, 2017" and "if she found as a fact the complainant expressed a genuine lack of consent through words or conduct." *[Ex. C, May 31 Transcript at 8:9-44].* Counley responded yes to both questions. *[Id.]*

114. After Counley testified yes to both of the questions, Johnson asked what evidence she relied on to make a factual finding that Jane Roe expressed a lack of consent and how she viewed that evidence. *[Ex. C, May 31 Transcript at 8:36-39].* At which point, Plaintiff objected on the basis of hearsay. *[Ex. C, May 31 Transcript at 9:3-37].*

115. After Johnson completed his direct examination of Counley, Plaintiff was given the opportunity and did cross-examine Counley. *[Ex. C, May 31 Transcript at 12:33-20:45].*

---

[23] Plaintiff objects to the statement "that the investigative report was 'offered into evidence by Johnson,' as Defendants characterize it," and states that "[t]he transcript speaks for itself and shows that Johnson said, 'With that Ms. Chair I would respectfully request to present the investigative report and the investigator has a witness.' [Defendants' Exhibit C, 8:6-7]." Plaintiff's objection is sustained, and the court has excised the disputed language from the statement of facts.

116. Then, Jane Roe was given the opportunity to present her case and make her opening statement, but she declined. *[Ex. C, May 31 Transcript at 20:45-21:3].*

117. Thereafter, Plaintiff was given the opportunity to and did present his case. *[Ex. C, May 31 Transcript at 21:33].*

118. Plaintiff started with his opening statement. During his opening statement, in summary, Plaintiff:

- Described his relationship with her, including the assistance Plaintiff provided to Jane Roe;
- Stated Jane Roe lied about the nature and significance of their relationship;
- Testified regarding the July 24, 2017 incident and why he thinks she is making these allegations;
- Stated he had never attempted to intimidate or threaten Jane Roe; and
- Stated Jane Roe had asked not to press charges against him for stealing her gun (he divulged this information even though this information was redacted). *[Ex. C, May 31 Transcript at 21:33-23:18].*[24]

119. Then, Plaintiff called himself as a witness, and testified. In his testimony, Plaintiff:

- Described his accolades *[Ex. C, May 31 Transcript at 23:22-23:44];*
- Described how he met Jane Roe *[Ex. C, May 31 Transcript at 23:22-23:44];*
- Narrated the first time Plaintiff and Jane Roe were together romantically *[Ex. C, May 31 Transcript at 24:6-32];*
- Narrated the nature of their relationship in the spring of 2016 and summer of 2016 *[Ex. C, May 31 Transcript at 24:6-32];*
- Testified that Jane Roe had a history of resisting him, and that he has a shirt in front of him that she tore when they were wrestling in his bedroom *[Ex. C, May 31 Transcript at 24:33-47];*
- Testified that Jane Roe punched him in the face one day just because Plaintiff told her she had to leave and was trying to remove her things from his home *[Ex. C, May 31 Transcript at 24:33-47];*
- Testified that Jane Roe locked herself in a closet with a gun one time *[Ex. C, May 31 Transcript at 24:33-47];*
- Testified that Jane Roe is not a reliable historian and has a problem with veracity with telling the truth, and provided examples *[Ex. C, May 31 Transcript at 25:3-30];*

---

[24] Plaintiff objects that "Defendants' 'summary' of Plaintiff's opening statement is not accurate nor does it encompass the entirety of the opening statement. Plaintiff's opening statement speaks for itself. [Defendants' Ex. C, pp. 21:33-23:18]." Plaintiff's objection is overruled.

- Testified regarding Plaintiff's and Jane Roe's sexual activities prior to July 24, 2017 incident, including but not limited to:
  - Testified that Jane Roe "loved sex more than I did" *[Ex. C, May 31 Transcript at 25:21-30];*
  - Testified Plaintiff and Jane Roe had consensual sex regardless of locations *[Ex. C, May 31 Transcript at 26:1-5];*
  - Testified Jane Roe was sexually liberated and would masturbate oftentimes *[Ex. C, May 31 Transcript at 26:1-5];*
  - Testified Jane Roe just wanted to have physical, sexual relationship with him *[Ex. C, May 31 Transcript at 26:12-30];* and
- Testified regarding the July 24, 2017 encounter *[Ex. C, May 31 Transcript at 26:38-32:3];*
- Testified regarding the July 24, 2017 encounter, Jane Roe was "dressed to the nines" and was not "dressed that night like she invited me over because she was grieving her aunt that had a heart attack." *[Ex. C, May 31 Transcript at 27:31-28:50].*[25]

120. Plaintiff testified regarding Jane Roe's sexual history, despite being told on multiple occasions that Anaya determined such testimony was irrelevant as to whether Plaintiff sexually assaulted Jane Roe on July 24, 2017, except to the extent directly relevant to parties' course of conduct during the incident in question and is not unduly prejudicial to either party. *[Ex. C, May 31 Transcript at 26:38-32:3].*[26]

121. Further, Plaintiff testified regarding Jane Roe's mental health, despite being instructed at the beginning of the hearing that any discussion or speculation regarding the mental health of Jane Roe should not be introduced unless it is directly related to any concerns or interactions informed responses of the participants. *[Ex. C, May 31 Transcript at 26:38-32:3].*[27]

---

[25] Plaintiff objects that "Defendants' summary and characterization of Plaintiff's testimony is not accurate and takes things out of context. Plaintiff's testimony speaks for itself. [Defendants' Ex. C, pp. 21:33- 32:2]." Plaintiff's objection is overruled.

[26] Plaintiff states: "Uncontroverted that Anaya determined testimony regarding Jane Roe's sexual history was irrelevant except to the extent directly relevant to the parties' course of conduct during the June 24, 2017 incident and not unduly prejudicial to either party. However, Plaintiff's testimony was directly relevant to the parties' course of conduct during the June 24, 2017 incident. [Defendants' Ex. C, pp. 26:38- 32:3]." The second sentence of Plaintiff's statement is a legal conclusion and does not create a genuine issue of material fact.

[27] Plaintiff states: "Uncontroverted that Anaya instructed that testimony regarding Jane Roe's mental health should not be introduced unless directly related to any concerns or interactions informed responses of the participants. However, Plaintiff's testimony was directly related to concerns and interactions of the participants, Plaintiff and Jane Roe.

122. Once Plaintiff concluded his testimony, Johnson cross-examined Plaintiff. *[Ex. C, May 31 Transcript at 32:3-36:34]*.

123. Thereafter, Plaintiff did not attempt to call any other witness, including Jane Roe. *[Ex. C, May 31 Transcript]*.

124. Plaintiff did not call Jane Roe to testify, despite being instructed at the beginning of the hearing that Plaintiff "may present his opening statement and offer the testimony of any witnesses that are in attendance today." *[Ex. C, May 31 Transcript]*.[28]

125. After Plaintiff was done calling his witnesses, the University made closing arguments. *[Ex. C, May 31 Transcript at 36:47-38:2]*.

126. Then, Plaintiff made his closing argument. *[Ex. C, May 31 Transcript at 38:3-41:45]*.

127. During his closing argument, Plaintiff, despite being instructed not to discuss or speculate regarding Jane Roe's mental health, among other things, testified "she had a bag of cocaine at my house…she smoked too much marijuana she would become paranoid and have panic attacks, and she knows that she had a heart condition..." *[Ex. C, May 31 Transcript at 39:1-25]*.[29]

128. After both the University and Plaintiff rested their case, Plaintiff was given the opportunity to make an offer of proof, at the discretion of Anaya, and not as a matter of right under the Code. *[Ex. C, May 31 Transcript at 42:4-46:13]*. Specifically, Plaintiff

---

[Defendants' Ex. C, pp. 26:38-32:3]." The second sentence of Plaintiff's statement is a legal conclusion and does not create a genuine issue of material fact.

[28] Plaintiff states: "Controverted. Jane Roe was a party to the hearing, not a witness. Jane Roe was the 'complainant,' and therefore, Plaintiff understood that he was unable to call her as a witness. [Defendants' Ex. C, p. 5:48-50]. Further, Jane Roe refused to participate in the hearing, stating, 'I'm going to defer to the University and its attorneys because I'm just a student and I don't have an attorneys [sic] present and I don't feel comfort—or I feel uncomfortable by being [inaudible 1:05:22] practicing attorney.' [Defendants' Exhibit C, p. 20:46-48]. Anaya responded, 'Thank you. We will note that. Alright [Plaintiff] uh you have 15 minutes for an opening statement.' [Defendants' Ex. C, p. 21:1-2]." Plaintiff's statement that Jane Roe was "not a witness" is a legal conclusion. Plaintiff's further statement that he "understood that he was not allowed to call [Jane Roe] as a witness" is argumentative and is not directly supported by the evidence cited. Neither statement creates a genuine issue of material fact.

[29] Plaintiff states: "Controverted. Jane Roe's drug use and heart condition are not 'mental health' issues. [Defendants' Ex. C, p. 39:1-25]." Plaintiff's statement is argumentative and is not directly supported by the evidence cited; it does not create a genuine issue of material fact.

asked that all of the evidence that was redacted from his response be included as evidence and considered. *[Ex. C, May 31 Transcript at 46:7-11].*

129. Then, Anaya instructed the participants that the Conduct Board would move into a closed session to deliberate regarding the testimony and other evidence. *[Ex. C, May 31 Transcript at 46:17-20].*

130. Further, Anaya explained, if it was determined that Plaintiff violated the Student Code, then the Conduct Board would hear recommendations from both sides as to what appropriate sanctions should be considered. *[Ex. C, May 31 Transcript at 46:17-46:26].*

131. The Plaintiff proposed they make the recommendation for sanction prior to the Conduct Board moving into closed session, to which Anaya responded that they may not even need to discuss sanctions, because "[i]t is hard to know what the result of our deliberation would be." *[Ex. C, May 31 Transcript at 46:29-37].*

132. When Plaintiff expressed his concern that he did not want to rush the Conduct Board to make a decision, that the record before the Conduct Board is over 302 pages and that he wants them to listen to the audio recording "again and again," Anaya informed Plaintiff that all of the Conduct Board members had reviewed the hearing packet for at least 6 hours prior to the May 31 hearing. *[Ex. C, May 31 Transcript at 46:29-47:25].*

133. The Conduct Board adjourned at approximately 11:45, with the intent to come back at approximately 2 p.m., giving them sufficient time to deliberate and listen to the audio recording. *[Ex. C, May 31 Transcript at 48:2-49:14].*

134. During deliberation, per Plaintiff's request during the pre-hearing conference and the May 31 hearing, the Conduct Board listened to the audio recording. *[Ex. C, May 31 Transcript at 48:30-36].*

135. Upon resuming the hearing, the Conduct Board, through Anaya, announced that they had reached a decision, and found:

> [B]ased on the evidence presented at this hearing we find [Plaintiff] responsible for violating the student code of conduct 10 CC sexual assault is committed when an actor subjects a person to sexual penetration without the consent of the person. When the actor knew or should have known that the person was mentally or physically incapable of resisting or appreciating the nature of the person's own conduct or when the actor is 19 years of age or older and the person is at least 12 but less than 16 years of age. Specifically the board based their decision off of the respondent's own admission both in the hearing as well as in the recorded conversation at approximately one hour seven minutes and four seconds where the respondent admits complainant did not give consent on July 24, 2017. *[Ex. C, May 31 Transcript at 48:15-27].*

136. Upon Plaintiff questioning their finding, the Conduct Board, through Anaya explained: "what we based it off of at one hour seven minutes four seconds is where you actually stated and we listened to the recording uh the full recording uhm…OK uhm and it's at one hour seven minutes four seconds uhm the complainant [Plaintiff] says I just don't understand at what point we disagree? And you say of course you said--of course you said no. You didn't--of course you said no." *[Ex. C, May 31 Transcript at 48:28-44].*

137. The Conduct Board then moved into considering sanctions to impose on Plaintiff, and requested that the Conduct Board be advised of Plaintiff's academic history and disciplinary status. *[Ex. C, May 31 Transcript at 49:25-32].*

138. Johnson recommended expulsion from the University and provided his reasoning for that recommendation. *[Ex. C, May 31 Transcript at 49:35-50:11].*

139. Jane Roe also asked for expulsion and read a victim impact statement. *[Ex. C, May 31 Transcript at 50:20-40].*

140. Plaintiff recommended that he be allowed to take a leave of absence, and provided his reasoning for that recommendation. *[Ex. C, May 31 Transcript at 50:20-52:22].*

141. Before beginning to deliberate on the issue of sanctions, Anaya asked if the Conduct Board had any questions for Johnson, Plaintiff or Jane Roe, and there was none. *[Ex. C, May 31 Transcript at 52:33-37].*

142. After deliberating on the issue of sanctions, the Conduct Board imposed the sanction of expulsion. *[Ex. C, May 31 Transcript at 53:13-29].*

143. Anaya concluded the proceeding by notifying Plaintiff of his right to appeal the Conduct Board's decision. *[Id.]*

144. On June 6, 2018, a formal letter was sent to Plaintiff, notifying him of the Conduct Board's findings and his appeal rights. *[Ex. U, June 6 Decision Letter].*

145. In the June 6 letter, the Conduct Board explained:

The University Conduct Board determined that you were in violation of this provision [Student Code of Conduct, Appendix A, Section 10cc] based on the greater weight of the evidence available to it. While the Board considered all the evidence presented and based its decision on the totality of that evidence, the Board found it noteworthy that you acknowledged the Complainant declined sex by using the word "stop." Further, the following statements you made during the recorded telephone call were also significant in persuading the Board that you engaged in sexual intercourse without the Complainant's [Jane Roe] consent:

"I mean it's true then, you know, that I was overcoming your objections but it's also true, uhm, your objections weren't like I didn't find you attractive, I don't think of you that way, you were like well

34

if you're in a relationship now forget it and I was trying to tell you that I didn't care that I wanted to be with you." (p.1 of 25 — transcript of recorded phone call 10/20/2017)

"Of course you said—of course you said no. You didn't…of course you said no." (p.17 of 25 — transcript of recorded phone call 10/20/2017)

"(inaudible) honestly I couldn't' control myself I guess, I just wanted to be with you and be inside you and show you that there was nobody else but you." (p.24 of 25 — transcript of recorded phone call 10/10/2017) *[Id.]*

### J. Plaintiff's Appeal to Chancellor's Office

146. On June 15, 2018, Plaintiff, through his attorney Matthew J. Donnelly, appealed the Conduct Board's decision, on the grounds:

- The May 31, 2018 was not conducted fairly in light of the charges and evidence presented, not in conformity with prescribed procedures, and did not give the Respondent a reasonable opportunity to prepare and to present a rebuttal of the allegations presented;
- The sanction imposed—expulsion—is inappropriate; and
- The University acted without jurisdiction because the conduct issue in the appeal occurred off University premises. *[Ex. V, Appeal Letter].*

147. In support of his appeal, … , Plaintiff stated he "incorporates by reference as if fully set forth herein, all defenses set forth during the hearing of this matter before the Board on May 31, 2018." *[Id.]*[30]

148. Laurie Bellows, Interim Vice Chancellor for Student Affairs, was appointed as the Appeal Officer by Chancellor Ronnie Green. *[Ex. W, Appointment Letter].*

149. On July 26, 2018, Laurie Bellows issued her decision regarding Plaintiff's appeal ("July 26 letter"). *[Ex. X, Final Decision].*

150. In the July 26 letter, Bellows addressed each of the grounds for appeal, in great detail, and denied Plaintiff's appeal. *[Id.]*

---

[30] The court has excised, as argumentative and as not being supported by the cited evidence, Defendants' statement that Plaintiff incorporated defenses by reference "instead of articulating or specifying a basis for his appeal." Plaintiff's objection is sustained.

### K. Miscellaneous Facts

151. Until the final resolution on July 26, 2018, the University allowed Plaintiff to maintain his status as a student and attend classes. *[Johnson Affidavit, ¶ 25].*

152. During the pendency of the investigation or the University Conduct process, Plaintiff never requested an accommodation be provided to him. *[Johnson Affidavit, ¶ 22].*

153. To the University's knowledge, Plaintiff did not attempt to take advantage of the numerous resources the University notified Plaintiff were available to him for support. *[Johnson Affidavit, ¶ 26].*

154. The three members of the Conduct Board—Anaya, Robinson and Witt—received Title IX training prior to serving on the Conduct Board panel on May 31, 2018. *[Johnson Affidavit, ¶ 27].*

## VI. DISCUSSION

The Due Process Clause of the Fourteenth Amendment prohibits state governments from depriving "any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. "This clause has two components: the procedural due process and the substantive due process components." *Singleton v. Cecil*, 176 F.3d 419, 424 (8th Cir. 1999) (en banc) (citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833 (1998)). "Analysis of either a procedural or substantive due process claim must begin with an examination of the interest allegedly violated, and the possession of a protected life, liberty, or property interest is a condition precedent to any due process claim." *Id.* (quotation marks, alterations, and citations omitted). Substantive due process rights are created only by the Constitution, while procedural due process rights can be created by either state law or the Constitution. *Id.*

In this case, Plaintiff alleges he had a protected property interest in his status as a student at UNL. (Filing No. 25, ¶ 206.) Plaintiff does not specifically allege that he had a protected liberty interest in pursuing his doctorate degree, but he impliedly asserts such an interest in his brief. (Filing No. 55, pp. 14-15, 19.) Defendants in their reply brief address both types of interests. (Filing No. 56, pp. 3-4, 8.) For purposes of deciding the pending motion for partial summary judgment, therefore, the court will treat Count VI of the Amended Complaint as alleging that Plaintiff has either a protected property interest or a protected liberty interest in his education. The parties agree that Plaintiff alleges both procedural and substantive due process violations in Count VI. (Filing No. 41, pp. 39-51; Filing No. 55, pp. 18-21.)

Property interests are not created by the Constitution. "Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). But "federal constitutional law determines whether [a property] interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *McGuire v. Indep. Sch. Dist. No. 833*, 863 F.3d 1030, 1034 (8th Cir. 2017) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 757 (2005)).

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). But while a State-created liberty interest may be "entitled to the *procedural* protections of the Due Process Clause of the Fourteenth Amendment," *Van Orden v. Stringer*, 937 F.3d 1162, 1168 (8th Cir. 2019) (emphasis in original; quoting *Vitek v. Jones*, 445 U.S. 480, 488 (1980)), *cert. denied sub nom. Orden v. Stringer*, No. 19-6892, 2020 WL 873175 (U.S. Feb. 24, 2020), a state-created liberty interest cannot form the basis of a *substantive* due process claim. [31]

"Fundamental rights or liberties that are protected by substantive due process are those implicit in the concept of ordered liberty or derived from our Nation's history and tradition; they are not created by States." *Id.* The Supreme Court has held that pursuit of an education is not a fundamental right or liberty which is afforded explicit or implicit protection under the Constitution. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 33-35, 37 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution. Nor do we find any basis for saying it is implicitly so protected…. We have carefully considered each of the arguments supportive of the District Court's finding that education is a fundamental right or liberty and have found those arguments unpersuasive."); *see Plyler v. Doe*, 457 U.S. 202, 221 (1982) ("Public education is not a 'right' granted to individuals by the Constitution.").

---

[31] A state-created liberty interest arises when a state imposes "substantive limitations on official discretion." *Forrester v. Bass*, 397 F.3d 1047, 1055 (8th Cir. 2005) (quoting *Olim v. Wakinekona,* 461 U.S. 238, 249 (1983)).

## A. Sovereign Immunity

"A state agency or official may invoke the State's Eleventh Amendment immunity if immunity will 'protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.' ... State universities and colleges almost always enjoy Eleventh Amendment immunity." *Becker v. Univ. of Nebraska at Omaha*, 191 F.3d 904, 908 (8th Cir. 1999) (quoting *Hadley v. North Arkansas Community Technical College,* 76 F.3d 1437, 1438 (8th Cir. 1996)). UNL is part of the University of Nebraska, which is an arm of the State of Nebraska for purposes of the Eleventh Amendment. *See id.*; *Lundberg v. University of Nebraska,* No. 4:CV95-3448, 1996 WL 883606, at *3-10 (D.Neb. Nov.25, 1996) (citing cases).

"Actions in federal court seeking injunctive relief against state officials, however, are not always barred by the Eleventh Amendment. *Treleven v. Univ. of Minnesota*, 73 F.3d 816, 819 (8th Cir. 1996) (citing *Ex parte Young,* 209 U.S. 123, 155-56 (1908)). "*Ex parte Young* recognized that suits may be brought in federal court against state officials in their official capacities for prospective injunctive relief to prevent future violations of federal law." *Id.* (quoting *Fond du Lac Band of Chippewa Indians v. Carlson,* 68 F.3d 253, 255 (8th Cir. 1995)). "Additionally, state officials are 'persons' under § 1983 when sued for injunctive relief because such actions 'are not treated as actions against the State.'" *Id.* (quoting *Will v. Mich. Dep't of State Police,* 491 U.S. 58, 71 n. 10 (1989)).

"The Eleventh Amendment does not bar the relief of reinstatement." *Mahn v. Jefferson Cty., Missouri*, 891 F.3d 1093, 1099 (8th Cir. 2018); *see Treleven*, 73 F.3d at 819 ("[T]o the extent that the District Court, basing its decision on the Eleventh Amendment, granted summary judgment for Kidwell on Treleven's § 1983 claim for injunctive relief in the form of reinstatement, the judgment must be reversed."). "In fact, 'the great weight of case authority clearly supports treating reinstatement as an acceptable form of prospective relief that may be sought through *Ex parte Young*.'" *Id.* (quoting *Nelson v. University of Texas at Dallas*, 535 F.3d 318, 322 (5th Cir. 2008) (citing cases)). In sum, although Plaintiff cannot seek compensation from the UNL employees in their official capacities, reinstatement is not precluded by the Eleventh Amendment. *See Ashokkumar v. Elbaum*,

932 F. Supp. 2d 996, 1007 (D. Neb. 2013) ("[R]einstatement is prospective relief, including in graduate school studies.") (citation omitted).[32]

## B. Quasi-Judicial Immunity

The doctrine of quasi-judicial immunity extends judicial immunity "to officials other than judges ... because their judgments are functionally comparable to those of judges—that is, because they, too, exercise a discretionary judgment as a part of their function." *Hamilton v. City of Hayti*, 948 F.3d 921, 928 (8th Cir. 2020) (quoting *Antoine v. Byers & Anderson, Inc.*, 508 U.S. 429, 436 (1993)). "Weighing evidence, making factual determinations, determining sanctions, and issuing written decisions are duties functionally comparable to the duties performed by courts." *Moore v. Yardely*, 376 F. Supp. 3d 1004, 1009 (D. Neb. 2019) (quoting *Simes v. Arkansas Judicial Discipline & Disability Comm'n*, No. 4:10CV01047 JFB, 2012 WL 4469264, at *7 (E.D. Ark. Sept. 27, 2012), *aff'd*, 734 F.3d 830 (8th Cir. 2013).

Due to the presumption "that qualified, rather than absolute, immunity is sufficient to protect government officials in the exercise of their duties ... the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Hamilton*, 948 F.3d at 928 (quoting *Robinson v. Freeze*, 15 F.3d 107, 108 (8th Cir. 1994). The issue turns on "whether the official historically enjoyed such immunity at common law plus a practical analysis of the official's functions in modern times." *Id.* (quoting *Robinson*, 15 F.3d at 108).[33]

Defendants contend they are entitled to absolute immunity because their "functions during Plaintiff's conduct proceedings were similar to those involved in the judicial process":

> Counley, in her role as the investigator: investigated the complaint, made factual determinations, weighed the evidence, and issued a decision laying out her findings and recommendation for sanction. Anaya, in her role as Chair and member of the Conduct Board: weighed evidence, made factual

---

[32] However, "any determination that the student['s] college hearing violated [procedural] due process will not necessarily mandate reinstatement, only a new hearing." *Jones v. Snead*, 431 F.2d 1115, 1117 (8th Cir. 1970).

[33] Quasi-judicial immunity, like qualified immunity, is a personal defense. "[Q]uasi-judicial immunity is not available for defendants sued in their official capacities." *VanHorn v. Oelschlager*, 502 F.3d 775, 779 (8th Cir. 2007).

> determinations and sanction determinations by applying the findings of fact, issued a decision, ruled on procedural and factual questions, and more. Johnson, in his role as the Conduct Officer: presented evidence, called witnesses, investigated, and submitted the University's case to the Conduct Board. And, Bellows, in her role as Appeals Officer: reviewed the information and documents submitted in support of and in opposition of the appeal, made factual determination, weighed the evidence, and issued a written decision.

(Filing No. 41, p. 52.) While it is true that at least some of these functions resemble those performed by judges (or prosecutors),[34] this is not the end of the analysis.

Whether an executive official is entitled to absolute immunity "turns on a number of factors," which are: "(a) the need to assure that the individual can perform his [or her] functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal." *Buser v. Raymond*, 476 F.3d 565, 568 (8th Cir. 2007) (quoting *Krueger v. Lyng,* 4 F.3d 653, 656 (8th Cir. 1993); *see Cleavinger v. Saxner*, 474 U.S. 193, 202 (1985); *Butz v. Economou*, 438 U.S. 478, 512 (1978). Defendants do not specifically address these factors in their brief, and, consequently, each of them has failed to carry his or her burden of demonstrating that absolute immunity is justified in this case.

In *Wood v. Strickland,* 420 U.S. 308 (1975), the Supreme Court considered whether school board members who voted to expel a student were not entitled to quasi-judicial

---

[34] The Supreme Court has long recognized that "prosecutors are absolutely immune from liability under § 1983 for their conduct in 'initiating a prosecution and in presenting the State's case' insofar as that conduct is 'intimately associated with the judicial phase of the criminal process.'" *Woodworth v. Hulshof*, 891 F.3d 1083, 1089 (8th Cir. 2018) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991), in turn quoting *Imbler v. Pachtman*, 424 U.S. 409, 430-31 (1976)). This immunity extends to "actions preliminary to the initiation of a prosecution and actions apart from the courtroom" but not to "administrative duties and those investigatory functions that do not relate to ... the initiation of a prosecution or for judicial proceedings." *Id.* (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 273-74 (1993)). An official whose role was "functionally comparable to that of prosecutor" may also be entitled to absolute immunity. *See Simes v. Arkansas Judicial Discipline & Disability Comm'n*, 734 F.3d 830, 834 (8th Cir. 2013); *Thomason v. SCAN Volunteer Servs., Inc.,* 85 F.3d 1365, 1373 (8th Cir.1996).

immunity. The Court reasoned that, even though the board members were "adjudicators" and "judge[d] whether there [were] violations of school regulations," affording them absolute immunity was not appropriate because doing so "would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Id.* at 319-20. It held that "[i]n the specific context of school discipline, … a school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." *Id.* at 322.

The Third Circuit has applied *Wood* at the post-secondary education level, in an action brought by a professor who was terminated. *See Skehan v. Bd. of Trustees of Bloomsburg State Coll.*, 538 F.2d 53, 60–61 (3d Cir. 1976) ("Functionally, the school board members adjudicating a student discharge and the state college officials adjudicating a faculty termination are identically situated…. While we can determine on the present record that the defendants were performing nonjudicial adjudicatory functions within the scope of their official responsibilities, we cannot determine that they met the *Wood v. Strickland* test."). And in *Purisch v. Tennessee Tech. Univ.*, 76 F.3d 1414 (6th Cir. 1996), which involved due process and equal protection claims brought by a university professor who was denied tenure, the Sixth Circuit denied absolute quasi-judicial immunity to the dean of graduate studies, who acted as a grievance committee's hearing officer, and the university president, who affirmed the committee's assessment. The Court found that the grievance committee did not possess the necessary independence because its members were subordinates of the university president who chose the committee's members and reviewed their decision. *Id.* at 1422. Although the grievant was permitted to have an advisor at the hearing, the advisor was not permitted to act as an advocate, and therefore the grievant "did not have the same right to counsel as in a judicial proceeding." *Id.* In addition, the grievant was not permitted to cross-examine witnesses, and the committee did not have the power to subpoena witnesses. *Id.* Finally, the university's grievance policy was not subject to the Tennessee Administrative Procedures Act, and it provided only for an appeal to the university chancellor, not to the courts. *Id.*

There does not appear to be any court of appeals' decision which addresses quasi-judicial immunity in the specific context of student disciplinary proceedings at the post-secondary education level, but several federal district courts have held that college or

university officials are not entitled to quasi-judicial immunity in this situation. *See Doe v. Regents of Univ. of California*, No. 215CV02478SVWJEM, 2017 WL 4618591, at \*9 (C.D. Cal. June 8, 2017) ("*Wood's* holding makes clear that school officials are protected by qualified immunity, not absolute judicial immunity."), *rev'd on other grounds and remanded with directions to dismiss*, 891 F.3d 1147 (9th Cir. 2018); *Doe v. Baum*, 227 F. Supp. 3d 784, 795 (E.D. Mich. 2017) ("Individual defendants … maintain that they are entitled to absolute quasi-judicial immunity as members of the adjudicatory appeal panel. They are not…. With such clear contrary precedent from the nation's highest court [in *Wood*], one wonders why these defendants advanced this argument."), *rev'd on other grounds and remanded for further proceedings*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Rector & Visitors of George Mason Univ.*, No. 1:15-CV-209, 2015 WL 12806530, at \*1 (E.D. Va. Oct. 2, 2015) ("[G]overnment officials enjoy absolute immunity for their legislative and judicial acts, but school officials do *not* enjoy absolute immunity for the act of expelling a student.") (emphasis in original); *Grady v. Bd. of Trustees of N. Illinois Univ.*, 78 F. Supp. 3d 768, 780-82 (N.D. Ill. 2015) ("On balance, the grievance process in this case cannot be characterized as quasi-judicial in nature. The Grievance Committee Defendants were not akin to neutral judges and the proceedings here bore little resemblance to those of a court of law. For these reasons, it would be inappropriate to extend the protections of absolute judicial immunity to the Defendants in this case."); *Ward v. The Members of The Bd. of Control of E. Mich. Univ.*, No. 09-CV-11237, 2010 WL 1417784, at \*2-6 (E.D. Mich. Apr. 5, 2010) ("The [formal review committee (FRC)] members were not, in reality, independent decision-makers insulated from political or outside influence. ... Defendants … have also failed to demonstrate that sufficient safeguards exist with respect to FRC disciplinary proceedings, and appeals therefrom, to protect the constitutional rights of EMU students facing disciplinary action…. The instant defendants have not shown that, without absolute quasi-judicial immunity, there is a great potential for vexatious lawsuits."); *Commissioned II Love v. Yarbrough*, 621 F. Supp. 2d 1312, 1324-26 (S.D. Ga. 2007) ("In the instant case, the Court finds that Defendant Suggs [the hearing officer] is not entitled to quasi-judicial immunity. First, Defendants have not shown the presence of safeguards to protect those appearing before her. Second, Defendants have failed to show that Defendant Suggs, who Plaintiffs allege is a member of Savannah State University's faculty, is insulated from political influence. Finally, Defendant Suggs's decisions are only reviewable through the University's appeal system."); *Oladokun v. Ryan*, No. 06 CV 2330 (KMW), 2007 WL 3125317, at \*5-6 (S.D.N.Y. Oct. 23, 2007) ("Defendants do not show that SUNY Maritime's disenrollment procedures raise policy issues different from those in *Strickland*.… Furthermore, Defendants fail to demonstrate that SUNY Maritime's disenrollment process shares enough of the characteristics of the judicial process to merit

42

absolute immunity, and that the officials themselves were functioning in a manner sufficiently analogous to a judge or prosecutor.") (quotation marks, modifications, and citations omitted); *Carmichael-Milan v. Sailer*, No. C07-5091 RBL, 2007 WL 1655219, at *3-4 (W.D. Wash. June 6, 2007) (While some additional safeguards were in place in this case, and Pearson [as chairman of the student disciplinary committee] did not actually vote to uphold the suspension, the policy articulated in *Wood* … persuades the court that Pearson is not entitled to absolute, judicial immunity."); *Brown v. W. Connecticut State Univ.*, 204 F. Supp. 2d 355, 362–63 (D. Conn. 2002) ("*Butz,* which was decided only three years after *Wood,* does not overrule *Wood,* and in fact, cites it in support of the proposition that state officials are not generally entitled to absolute immunity for constitutional violations.… Accordingly, the Court concludes that defendants are entitled to raise only the defense of qualified immunity."); *Smith v. Rector & Visitors of Univ. of Virginia*, 78 F. Supp. 2d 533, 539 (W.D. Va. 1999) ("Defendants argue that Casteen is entitled to absolute immunity and cite *Ostrzenski v. Seigel,* 177 F.3d 245 (4th Cir.1999), for the proposition that "quasi-judicial" officials are entitled to absolute immunity when adequate procedural safeguards exist. However, *Ostrzenski* concerned medical review boards—not university presidents in a disciplinary context—and the case's language to which defendants refer is a generalized guidepost describing examples of and prerequisites for absolute immunity. *See id.* at 248-49. Instead, *Wood* … is controlling here and leads to the conclusion that absolute immunity is inapplicable."); *Tonkovich v. Kansas Bd. of Regents*, No. CIV. A. 95-2199-GTV, 1996 WL 705777, at *9-14 (D. Kan. Nov. 22, 1996) ("Applying the *Butz* factors, the court concludes that plaintiff's amended complaint alleges facts that defeat the Hearing Committee members' claim of absolute immunity in their motion to dismiss. Plaintiff's allegations concerning his dismissal hearing are that the adjudication did not have the 'identification with the judicial process of the kind and depth that has occasioned absolute immunity.'" (quoting *Cleavenger,* 474 U.S. at 503), *rev'd on other grounds and remanded with directions to dismiss*, 159 F.3d 504 (10th Cir. 1998). *But see Doe v. Univ. of Arkansas-Fayetteville*, No. 5:18-CV-05182, 2019 WL 1493701, at *13 (W.D. Ark. Apr. 3, 2019) ("Here, individual capacity defendants … , as appeal hearing panel members, are entitled to quasi-judicial immunity. [They] served in an official function similar to the judicial process. The panel members heard evidence, engaged in questioning of witnesses, made findings of facts and applied those findings to UA policy before issuing a final decision and sanctions. The hearing panel members are in a position where an adverse decision on their part may result in a § 1983 lawsuit for damages by disappointed students, such as the instant claim. Finally, Title IX regulations and the due process clause of the Fourteenth Amendment work in conjunction to ensure that hearing panel members and university

officials act constitutionally in adjudicating sexual assault claims."), *appeal docketed*, No. 19-1842 (8th Cir. Apr. 24, 2019).[35]

The individual Defendants in the present case are all University employees. They do not appear to be bound by precedent. Although a student who is the subject of a sexual misconduct complaint enjoys certain procedural safeguards, such as the right to a hearing, *see* Student Code of Conduct, App. A (Filing No. 41-7, pp. 17-25), these fall short of what would be provided to a defendant in a court of law, or, for that matter, in a state agency hearing. For example, a student respondent has the right to be assisted by an advisor, including legal counsel, but "[t]he role of the advisor is limited to providing advice … which does not disturb Conduct proceedings," *id.* at § 5f, and "[d]irect questioning of the witnesses … may be limited," *id.* at § 5g. Defendants deny that the Nebraska Administrative Procedure Act applies to Conduct proceedings.[36] (Filing No. 28, pp. 24-25, ¶ 228.) Finally, Defendants have failed to demonstrate that the doctrine of qualified immunity provides insufficient protection against nuisance suits. *See Wood*, 420 U.S. at 319-20. For these and other reasons suggested by the foregoing authorities applying the *Butz* factors in comparable cases, Defendants are not entitled to the entry of summary judgment on Count VI based on absolute quasi-judicial immunity.

### C. Qualified Immunity

Qualified immunity does not apply to a claim for injunctive relief, but it shields government officials from suits for damages under § 1983 if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019), *as amended* (Nov.

---

[35] It has been stated that "[t]he Eighth Circuit appeal in the University of Arkansas case—which raises due process questions of notice, fairness of the hearing, and cross-examination—will be the decision to watch in 2020." Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. Legis. & Pub. Pol'y 49, 112-13 (2020). The court notes that the appeal was argued and submitted to the Eighth Circuit on January 15, 2020.

[36] Without prejudging Plaintiff's Nebraska Administrative Procedure Act ("APA") claim (Count V of the Amended Complaint), the court notes that in *Kerr v. Bd. of Regents of Univ. of Nebraska*, 739 N.W.2d 224 (Neb. App. 2007), the Nebraska Court of Appeals affirmed the dismissal, for lack of jurisdiction, of an action brought by a former law student who was challenging his dismissal for plagiarism. The Court determined that the decision was not made by the Board of Regents, but rather, by the College of Law's student-faculty honor committee and dean, who were not "agencies" under the APA. *Id.* at 229.

26, 2019) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). The immunity is an *immunity from suit*, not merely from liability. *Id.* (emphasis in original). It is designed "to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (alteration in original) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Anderson as trustee for next-of-kin of Anderson v. City of Minneapolis*, 934 F.3d 876, 881 (8th Cir. 2019) (quoting *Walker v. City of Pine Bluff*, 414 F.3d 989, 992 (8th Cir. 2005)).

"Whether a given set of facts entitles the official to summary judgment on qualified immunity grounds is a question of law. But if there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." *Olson v. Bloomberg*, 339 F.3d 730, 735 (8th Cir. 2003) (quoting *Greiner v. City of Champlin*, 27 F.3d 1346, 1352 (8th Cir. 1994)).

The court must follow a two-step inquiry in a qualified immunity analysis: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Jackson v. Stair*, 944 F.3d 704, 710 (8th Cir. 2019) (quoting *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009)). If Plaintiff cannot satisfy both prongs, Defendants Johnson, Bellows, Counley, and Anaya, in their individual capacities, are entitled to qualified immunity. *See Correia v. Jones*, 943 F.3d 845, 847 (8th Cir. 2019); *see also Davis v. Chase Cty. Sch. Dist. No. 536*, No. 7:17-CV-5007, 2019 WL 1506690, at *4 (D. Neb. Apr. 5, 2019) ("To withstand a motion for summary judgment on qualified immunity grounds, a civil rights plaintiff must (1) assert a violation of a constitutional right; (2) demonstrate that the alleged right is clearly established; and (3) raise a genuine issue of fact as to whether the official would have known that his alleged conduct would have violated the plaintiff's clearly established right.").

Courts "have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). Especially where a decision on qualified immunity is more straightforward than resolving a novel question of constitutional law, the Supreme Court has counseled that "courts should think hard, and then think hard again, before turning small cases into large ones." *Hamner*, 937 F.3d at 1175-76 (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

A clearly established right is one that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Reichle v. Howards,* 566 U.S. 658, 664 (2012)). The relevant question is whether a reasonable officer would have fair warning that his conduct was unlawful. *Jackson v. Stair*, 944 F.3d 704, 711 (8th Cir. 2019). "A plaintiff need not always identify a case directly on point, but controlling authority or a robust consensus of cases of persuasive authority must put the statutory or constitutional question beyond debate." *Anderson*, 934 F.3d at 881 (quoting *Swearingen v. Judd*, 930 F.3d 983, 987 (8th Cir. 2019)).

The Supreme Court has "repeatedly told courts ... not to define clearly established law at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). The dispositive question is "whether the violative nature of *particular* conduct is clearly established." *Ibid.* (emphasis in original). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen,* 543 U.S. 194, 198 (2004) (per curiam)). Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton,* 483 U.S. 635, 639 (1987)).

### 1. Substantive Due Process

In two decisions, the Supreme Court has "assumed, without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 (1985) (citing *Board of Curators, Univ. of Mo. v. Horowitz,* 435 U.S. 78, 91-92 (1978)).[37] "In neither case did the Court affirmatively recognize a substantive due process

---

[37] The plaintiff in *Ewing* was a university student enrolled in a six-year program of study culminating in an undergraduate degree and medical degree. He was dismissed after failing an examination that was required to complete the final two years of the program. "The constitutionally protected interest alleged by Ewing in his complaint, ... and found by the courts below, derive[d] from Ewing's implied contract right to continued enrollment free from arbitrary dismissal." *Ewing*, 474 U.S. at 223. The plaintiff in *Horowitz* was a medical student who was dismissed during her final year of study for failure to meet academic standards. She "never alleged that she was deprived of a property interest," but instead "argued that her dismissal deprived her of 'liberty' by substantially impairing her

right in a student's continued enrollment in a public institution. Indeed, in both *Ewing* and *Horowitz,* the Court expressly stated that it would not reach the issue of whether the plaintiff's assumed property interest gave rise to a substantive right under the Due Process Clause because the plaintiff's claim failed even if the Court were to assume such a right." *Galdikas v. Fagan*, 342 F.3d 684, 689-91 (7th Cir. 2003), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).

"Following the Supreme Court's lead, [the Eighth Circuit has] repeatedly assumed without deciding that an academic dismissal may be challenged on substantive due process grounds but upheld the summary rejection of those claims, applying the Supreme Court's deferential standard." *Keefe v. Adams*, 840 F.3d 523, 533 (8th Cir. 2016) (citing *Monroe v. Ark. State Univ.*, 495 F.3d 591, 594-97 (8th Cir. 2007); *Richmond v. Fowlkes*, 228 F.3d 854, 859 (8th Cir. 2000); *Schuler v. Univ. of Minn.*, 788 F.2d 510, 515-16 (8th Cir. 1986)). *But cf. Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975) (where academic dismissal from medical school was accompanied by notification to national association that student lacked "intellectual ability," which would effectively preclude him from continuing his studies elsewhere, he was deprived of significant liberty interest and was entitled to informal hearing before administrative body which dismissed him).[38]

Thus, in this circuit, "[w]hether a student who is subject to academic dismissal may maintain a cause of action for the violation of his right to substantive due process remains an open question." *Richmond*, 228 F.3d at 859; s*ee also Doe v. Bd. of Regents of Univ. of Nebraska*, 788 N.W.2d 264, 292 (Neb. 2010) ("Whether a student who is subject to academic dismissal has a cause of action for the violation of his or her right to substantive due process remains an open question."), *overruled on other grounds by Davis v. State*, 902 N.W.2d 165 (Neb. 2017).[39]

---

opportunities to continue her medical education or to return to employment in a medically related field." *Horowitz*, 435 U.S. at 82.

[38] In a footnote to its *Greenhill* decision, the Eighth Circuit stated: "In view of our decision on Greenhill's 'liberty' claim, it is unnecessary for us to pass on his alternative contention that, once admitted to the College of Medicine, he had a property interest in continuing and completing his medical education. In this context, however, we note that the status of students at a graduate facility, to which admission is limited and determined on a competitive basis, may differ significantly from that of pupils at the elementary or high school level, where a free education is normally guaranteed by state law and attendance is required." 519 F.2d at 8, n. 9.

[39] As will be discussed in the next section of this memorandum opinion, with respect to *procedural* due process claims "[t]here is a clear dichotomy between a student's due

The Eighth Circuit also concluded it was not necessary to decide the question in *Ikpeazu v. Univ. of Nebraska*, 775 F.2d 250 (8th Cir. 1985), in which a pharmacy student claimed he was denied substantive due process when the defendant instructors gave him failing grades, which led to his dismissal from the college. In affirming the district court's dismissal of plaintiff's claim, the Court of Appeals discussed, but did not decide, whether the student had a cognizable property right under Nebraska law. The Court stated:

> Relevant to consideration of Ikpeazu's substantive due process claim is the question whether his dismissal deprived him of a protected interest in property. *Board of Regents v. Roth,* 408 U.S. 564, 576-78, 92 S.Ct. 2701, 2708-09, 33 L.Ed.2d 548 (1972). It is now axiomatic that property interests are not created by the federal Constitution, but are created and "defined by existing rules or understandings that stem from an independent source such as state law...." *Id.* at 577, 92 S.Ct. at 2709. Such "rules or understandings" may arise by statutory or common law, and may be found in the terms of an express or implied contract. *See Perry v. Sindermann,* 408 U.S. 593, 601-02, 92 S.Ct. 2694, 2699-2700, 33 L.Ed.2d 570 (1972). A protected property interest may attach to any such understanding that, in substance, gives rise to "an individual entitlement which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 430, 102 S.Ct. 1148, 1154, 71 L.Ed.2d 265 (1982).
>
> In somewhat comparable circumstances we have observed that the relationship between a university and a student is ordinarily contractual in nature, and that the terms of that contract may be implied from a student handbook or other statements of academic policy. *Corso v. Creighton University,* 731 F.2d 529 (8th Cir.1984). Here, the University of Nebraska promulgated a publication setting forth a grievance procedure for student appeals of allegedly capricious or improper grades. This procedure does appear to imply a contractual expectation in students that they will not be graded capriciously, and thus to create a cognizable property right in nonarbitrary grading. That the publication only sets forth a procedure for appealing a grade, and not an express promise that grading shall not be arbitrary, arguably should not alter our conclusion. "'Property' cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985).

---

process rights in disciplinary dismissals and in academic dismissals." *Keefe*, 840 F.3d at 537 (Kelly, J., concurring in part and dissenting in part) (quoting *Horowitz*, 435 U.S. at 87 n. 4). This distinction is unimportant for present purposes, however.

> Ikpeazu, in asserting a property interest relies in large part upon Nebraska state cases, *Scriven v. Scriven,* 153 Neb. 655, 45 N.W.2d 760, 765 (1951), and *Wood v. Security Mutual Life Ins. Co.,* 112 Neb. 66, 198 N.W. 573, 575 (1924), which define "[a] calling, business or profession, chosen and followed" as property. *Scriven,* 45 N.W.2d at 765. He would have us apply the rationale of those cases to pursuit of an academic degree. However, we find it unnecessary here authoritatively to undertake determination of the federal constitutional significance of the Nebraska decisions, or indeed other than as *obiter dictum* of the full constitutional significance of Ikpeazu's contract rights as a student hereinabove discussed.

*Id.* at 253. Observing that "[a]n actionable deprivation in an academic dismissal case is proved only if there was no rational basis for the university's decision, or if the decision was motivated by bad faith or ill will unrelated to academic performance," and "accord[ing] due respect for the discretion of the faculty members, those best qualified to make such judgments," the Court of Appeals held that the plaintiff's grades and subsequent dismissal were not arbitrary as a matter of law. *Id.* at 254.

Neither the Supreme Court nor the Eighth Circuit has clearly established that continued enrollment in a post-secondary education program is a property or liberty interest protected by the Fourteenth Amendment's guarantee of substantive due process, and Plaintiff has not identified "a robust consensus of cases of persuasive authority" in support of his substantive due process claim.[40] Plaintiff has also failed to demonstrate that he has a state-created property right that could give rise to a substantive due process claim. The individual Defendants are therefore entitled to qualified immunity. *See*, *e.g.*, *Childers v. Fla. Gulf Coast Univ. Bd. of Trustees*, No. 2:15-CV-722-FTM-MRM, 2017 WL 1196575, at *7 (M.D. Fla. Mar. 31, 2017) ("An assumption by the Supreme Court and the Eleventh Circuit that individuals have a protected property right in their continuing post-secondary education is not a holding. An assumption is no more than dicta and, thus, cannot clearly

---

[40] Only the First, Sixth, and Tenth Circuits have recognized a generalized property interest in higher education. *See* Dalton Mott, Comment, *The Due Process Clause and Students: The Road to A Single Approach of Determining Property Interests in Education*, 65 U. Kan. L. Rev. 651, 659-60 (2017). The Second, Third, Fourth, Seventh, Ninth, and Eleventh Circuits have made state-specific inquiries to determine whether a property interest exists. *See id.* at 658. The Fifth Circuit, like the Eighth Circuit, has assumed without deciding that such a property interest exists. *See id.* at 663. While the Supreme Court held in *Goss v. Lopez,* 419 U.S. 565, 575-76 (1975), that students in primary school have a liberty interest in their education, the question "whether liberty interests also applied to students in higher education ... has not yet been settled." Mott, *supra*, at 661.

establish the law for purposes of qualified immunity.") (quoting *Hamil v. Vertrees*, No. 98-D-508-N, 2001 WL 135716, at *9 (M.D. Ala. Jan. 10, 2001)).[41] But even assuming that Plaintiff has some constitutionally protected interest,[42] the evidence before the court does not support a finding that there was a substantive due process violation.

The "core of the concept [of substantive due process is] protection against arbitrary action" by the government. *Putnam v. Keller*, 332 F.3d 541, 547 (8th Cir. 2003) (quoting *Lewis,* 523 U.S. at 845). "While due process protection in the substantive sense limits what the government may do in both its legislative, and its executive capacities, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Lewis*, 523 U.S. at 846 (internal citations omitted). "[Supreme Court] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* (quoting *Collins v. City of Harker Heights,* 503 U.S. 115, 128 (1992)). "In other words, to establish a substantive due process claim, [Plaintiff] has to show that the [UNL] officials' arbitrary action 'shocks the conscience.'" *Putnam*, 332 F.3d at 547-48 (quoting *Lewis*, 523 U.S. at 846). [43]

---

[41] The Eleventh Circuit found a state-created property interest in *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012). Previously, it had followed the Supreme Court's lead and assumed a property interest. *See Haberle v. Univ. of Alabama in Birmingham*, 803 F.2d 1536, 1539 n. 1 (11th Cir. 1986).

[42] As will be discussed in the next section of this memorandum opinion, the Eighth Circuit has flatly stated that college students enjoy procedural due process protections.

[43] In a footnote in its *Singleton* decision, the Eighth Circuit stated that "[a]n alternative way to bring a substantive due process claim is to assert that the government's actions either 'shock[ ] the conscience' or 'offend[ ] judicial notions of fairness ... or ... human dignity.'" 176 F.3d at 425 n. 7 (quoting *Riley v. St. Louis Cnty.,* 153 F.3d 627, 631 (8th Cir. 1998)). However, in a subsequent decision, Judge Bye, concurring and writing for an en banc majority on the issue, refuted this footnote by stating that in *Singleton* "and other cases, we confused two *elements* of a plaintiff's substantive due process claim based upon executive action with two distinct *theories* of recovery." *Moran v. Clarke,* 296 F.3d 638, 651 (8th Cir.2002) (en banc) (emphasis in original). Judge Bye clarified that "[i]n every case in which a plaintiff challenges the actions of an executive official under the substantive component of the Due Process Clause, he must demonstrate *both* that the official's conduct was conscience shocking, *and* that the official violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" *Id.* (emphasis in original) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 720-21 (1997)), *abrogation on other grounds recognized by Johnson v. McCarver,*

"[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849. Here, however, the court "may also consider conduct that evinces a 'deliberate indifference' to protected rights of [Plaintiff], if the [UNL] officials had an opportunity to consider other alternatives before choosing a course of action." *Putnam*, 332 F.3d at 548 (holding that "deliberate indifference" standard applied in § 1983 action brought by former faculty member of community college against the college and various officials, alleging deprivation of liberty interests in connection with his discharge); *see Truong v. Hassan*, 829 F.3d 627, 631 (8th Cir. 2016) ("The lower deliberate indifference standard 'is sensibly employed only when actual deliberation is practical.'") (quoting *Lewis*, 523 U.S. at 848-49); *Neal v. St. Louis County Bd. of Police Comm'rs*, 217 F.3d 955, 958 (8th Cir. 2000) ("[W]here a state actor is afforded a reasonable opportunity to deliberate various alternatives prior to electing a course of action, the chosen action will be deemed 'conscience shocking' if the action was taken with 'deliberate indifference.'"). "Mere negligence can never be conscience-shocking and cannot support a claim alleging a violation of substantive due process rights." *Hart v. City of Little Rock*, 432 F.3d 801, 805 (8th Cir. 2005).

"Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." *Truong*, 829 F.3d at 631 (8th Cir. 2016) (quoting *Terrell v. Larson*, 396 F.3d 975, 981 (8th Cir. 2005). This question must be decided with respect to each individual Defendant, rather than collectively. *Cf. Lunon v. Botsford*, 946 F.3d 425, 429 (8th Cir. 2019) ("We require 'an individualized analysis of each officer's alleged conduct to determine whether the factual allegations ... were sufficient to overcome qualified immunity.") (quoting *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013)).

### a. *Defendant Jake Johnson*

Plaintiff alleges that Johnson, as Assistant Vice Chancellor for Student Affairs, represented UNL at the Conduct Board hearing on May 31, 2018, and sent a letter to Plaintiff on June 6, 2018, informing him of the Board's decision. (Filing No. 25, ¶¶ 101, 120.) Plaintiff has presented no evidence of any wrongdoing by Johnson. Defendant's

---

942 F.3d 405, 411 (8th Cir. 2019); *see Akins v. Epperly,* 588 F.3d 1178, 1183 (8th Cir. 2009); *Isaiah v. City of Pine Lawn*, No. 4:12CV230 HEA, 2015 WL 417581, at *4 (E.D. Mo. Feb. 2, 2015).

evidence shows that Johnson recommended Plaintiff's expulsion (see Statement of Facts ["SOF"] ¶ 138), but the court can find no evidence that Johnson acted with deliberate indifference in making this recommendation or in taking any other actions. (See, generally, SOF ¶¶ 62-87, 93-97, 104, 111-114, 122, 138, and exhibits cited therein.)

### b. *Defendant Laurie Bellows*

Plaintiff alleges that Bellows, as Interim Vice Chancellor of Student Affairs and as the Chancellor-appointed Appeals Officer, denied Plaintiff's appeal on July 26, 2018. (Filing No. 25, ¶ 140.) Plaintiff criticizes her decision in a several respects: (1) determining that the Student Code applied to the July 24, 2017 off-campus sexual assault because Defendant met the definition of a "student" at the time and the conduct alleged was so severe that no formal finding by the Dean of Students as to the adverse effect on the University community was necessary to establish jurisdiction (*ibid.*, ¶¶ 141-144); (2) rejecting Plaintiff's claims that he was not allowed to question Jane Roe, obtain a recording of her statements, or present evidence of her past untruthfulness and mental state (*ibid.*, ¶ 145); (3) finding that information redacted from the investigation file was irrelevant and would not have affected the Board's decision (*ibid.*, ¶¶ 146); and (4) concluding that the sanction imposed was not overly harsh (*ibid.*, ¶ 150).

Plaintiff has presented no evidence of wrongdoing by Bellows, who, like the members of the Conduct Board, is "entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven." *Ikpeazu*, 775 F.2d at 254. The court's review of Defendants' evidence also has not disclosed any conscious-shocking behavior on her part. (See, generally, SOF ¶¶ 148-150, and exhibits cited therein.)

### c. *Defendant Meagan Counley*

Plaintiff alleges that Counley, as UNL's Title IX Deputy Coordinator, sent a letter to him on December 21, 2017, charging that Plaintiff had violated the Student Code of Conduct by committing sexual harassment and sexual assault (Filing No. 55, ¶ 69); conducted an investigation and notified Plaintiff by letter dated April 6, 2018, it was more likely than not that he had committed sexual assault on July 24, 2017, but that the other allegations had been resolved in his favor (*ibid.*, ¶ 73); recommended Plaintiff's expulsion (*ibid.*, ¶ 99); and testified at the hearing.

In the context of a criminal investigation, the Eighth Circuit has held that "[t]o establish a constitutional violation based on an inadequate investigation, a plaintiff must show that the defendant officer's 'failure to investigate was intentional or reckless, thereby shocking the conscience.'" *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012) (quoting *Cooper v. Martin,* 634 F.3d 477, 481 (8th Cir. 2011)). In particular, "the following circumstances indicate reckless or intentional failure to investigate that shocks the conscience: (1) evidence that the state actor attempted to coerce or threaten the defendant, (2) evidence that investigators purposefully ignored evidence suggesting the defendant's innocence, (3) evidence of systematic pressure to implicate the defendant in the face of contrary evidence." *Id.* (quoting *Akins v. Epperly,* 588 F.3d 1178, 1184 (8th Cir. 2009)). "Mere negligent failure to investigate, such as failing to follow up on additional leads, does not violate due process." *Id.*

Plaintiff states he has no personal knowledge that Counley followed up on his statement to her that Jane Roe previously had been abusive toward him, or on his request that she investigate Jane Roe's medical and mental health history (see Plaintiff's affidavit, ¶¶ 4-5, Filing No. 55 at p. 25), but this does not establish that she purposely ignored the information. Moreover, it has not been shown that an investigation into these tangential matters would likely have affected Counley's findings and recommendation or changed the outcome of the Conduct Board hearing. In fact, Plaintiff's references to these matters in his written response to the December 21, 2007 complaint letter were redacted by the Board chair (Defendant Anaya), who also determined that any discussion during the hearing of subjects not directly related to the alleged incident on July 24, 2017 would be limited. (See, generally, SOF ¶¶ 89, 108, 120, 121, and exhibits cited therein.)

Regarding Counley's testimony, Plaintiff does not identify any false or misleading statements. The Amended Complaint only references favorable testimony, to the effect that the recorded telephone conversations between Plaintiff and Jane Roe did not contain any admission of wrongdoing by Plaintiff. (See Filing No. 25, ¶¶ 108, 116, 117, 120, 124.)

In short, Plaintiff has failed to demonstrate that Counley's investigation or hearing testimony violated his substantive due process rights.

### d. *Defendant Toni Anaya*

Plaintiff alleges that Anaya, as chair of the Conduct Board, met with Jane Roe and UNL representatives "prior to and without Plaintiff present to discuss the evidence and

what would be admitted and what would not be admitted into evidence." (Filing No. 25, ¶ 104.) This presumably is a reference to a pre-hearing conference that was held on May 16, 2018. (See SOF ¶ 73 and cited exhibit.) A separate pre-hearing conference was held with Plaintiff on May 25, 2018. (See SOF ¶ 75 and cited exhibit.) These conferences were conducted in accordance with applicable Student Code of Conduct provisions. (See SOF ¶ 76 and cited exhibits.) Plaintiff's Amended Complaint does not contain any other direct allegations against Anaya, but he complains generally about not being allowed to cross-examine Jane Roe and various evidentiary rulings. (Filing No. 25, ¶¶ 107, 114, 115-118.) These allegations concern procedural due process claims, not substantive due process claims.

### 2. Procedural Due Process

Defendants Johnson, Bellows, Counley, and Anaya, in their individual capacities are also entitled to qualified immunity on Plaintiff's procedural due process claims because Plaintiff has failed to produce any evidence or legal authority to support his allegations that he has a property or liberty interest in his college education under Nebraska law. Also, as will be discussed next, Plaintiff has failed to prove that the alleged constitutional violations are based on clearly established federal law.

The Eighth Circuit has stated that, in a disciplinary case, "procedural due process must be afforded a student on the college campus 'by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures.'" *Jones*, 431 F.2d at 1117 (affirming denial of preliminary injunction) (quoting *Esteban v. Cent. Mo. State Coll.*, 415 F.2d 1077, 1089 (8th Cir. 1969)); *see Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 440 (8th Cir. 1998) (finding that college student, who was expelled from nursing school for violating college's standards of conduct, was afforded sufficient procedural due process); *Keefe*, 840 F.3d at 535 ("Even if this was a purely disciplinary decision, as Keefe contends, he was entitled to 'oral or written notice of the charges against him, an explanation of the [college's] evidence, and an opportunity to present his side of the story.'") (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985)).[44] But the Court has cautioned "that it is not sound to draw any analogy

---

[44] By contrast, the Eighth Circuit only requires that "a student who is dismissed for academic reasons from a public university must be afforded notice of faculty dissatisfaction and potential dismissal, and the dismissal decision must be careful and deliberate." *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000). "A formal hearing is not required for an academic dismissal." *Id.* "A disciplinary dismissal is usually based on a student's

between student discipline and criminal procedure." *Id.* (quoting *Esteban*, 415 F.2d at 1089).[45]

Plaintiff contends he "was not allowed to present his side of the case with all necessary protective measures" because he was not given the opportunity to cross-examine Jane Roe at the Conduct Board hearing and was not permitted to offer certain evidence. (Filing No. 55, pp. 15-17.) The only Defendant who allegedly is responsible for these claimed procedural errors is Toni Anaya, as Plaintiff argues:

> On the one hand, Anaya, the chairperson of the Conduct Board, informed the participants that "[t]he University conduct board is not a court of law. And is not bound by the strict rules of evidence and procedures prescribed for the civil and criminal courts." [Defendants' Ex. C, p. 4:45-47]. But then on the other hand, Anaya made evidentiary determinations that were *more* restrictive than a criminal or civil court, those determinations worked to prohibit the Plaintiff from introducing relevant evidence.

---

misconduct. It is an objective determination and not dependent upon the analytical expertise of professional academicians." *Henderson v. Engstrom*, No. CIV 1O-4116-RAL, 2012 WL 4009108, at *7 (D.S.D. Sept. 12, 2012) (quotation marks and citations omitted). "Disciplinary dismissals 'are those involving the violation by a student of valid rules of conduct.'" *Id.* (quoting *Fenje v. Feld,* 398 F.3d 620, 625 (7th Cir. 2005)). The present case involves a disciplinary dismissal.

[45] The Eighth Circuit in these decisions did not discuss whether the college students had a protected property or liberty interest, although Judge Blackmun, writing for the panel majority in *Esteban*, commented: "We are not certain that it is significant whether attenance [*sic*] at such a college, or staying there once one has matriculated, is a right rather than a privilege." 415 F.2d 1089. *Estaban* involved First Amendment and substantive due process challenges to a "student code of conduct" regulation, as being vague and overly broad. Consequently, the oft-cited language about procedural due process requirements is *obiter dictum*, made with reference to an earlier district court decision, which was not appealed. *See id.* at 1081; *Esteban v. Cent. Missouri State Coll.*, 277 F. Supp. 649, 651-52 (W.D. Mo. 1967) (stating that "[i]t is not disputed that the 14th amendment with its due process clause applies to state educational institutions," and holding that "students at a state college are entitled to procedural due process before they can be suspended from college."). The Eighth Circuit's subsequent decisions in *Jones*, *Woodis*, and *Keefe* did involve procedural due process claims. At the district court level in *Keefe*, "Defendants assumed that Keefe had a valid property interest in his enrollment in the associate degree nursing program." *Keefe v. Adams*, 44 F. Supp. 3d 874, 884 (D. Minn. 2014). It is not known whether the district court decisions in *Jones* and *Woodis* touched upon this issue.

Such relevant evidence Anaya denied includes information regarding Jane Roe's mental state at the time she reported allegations, and mental health disorders [Defendants' Ex. C, p.6:12-14]; multiple other sexual assault allegations Jane Roe made against Plaintiff, which were found to be without merit [Defendant's' Ex. C, p. 6:6-12]; and transcripts of several other phone calls between Plaintiff and Jane Roe from around the same time as the recorded phone call [Defendants' Ex. B, pp. 23:10-25:42], among other items.

* * *

… Plaintiff was informed on multiple occasions that certain information would not be admitted, e.g., any evidence regarding the parties' past relationship and sexual history—information that is surely relevant to the issue of consent. Anaya's prohibition of such evidence indicates that even had Plaintiff been allowed to question Jane Roe, the limitations placed thereon would have made the effort futile.

The fact is, Jane Roe, at the hearing, refused to participate, stating, "I'm going to defer to the University and its attorneys because I'm just a student and I don't have an attorneys present and I don't feel comfort – or I feel uncomfortable by being [inaudible 1:05:22] practicing attorney." [Defendants' Ex. C, p. 20:46-48]. While part of the quote is marked as inaudible, the implication is that Jane Roe stated she did not want to participate because she didn't want to be questioned by a practicing attorney, and Plaintiff was a practicing attorney. The Conduct Board accepted Jane Doe's [*sic*] statement, which any reasonable person present at the time would understand to mean that Jane Doe [sic] was not subject to questioning.

Furthermore, Jane Doe [*sic*] was not a witness—she was the Complainant, a party to the hearing. When Anaya was describing the procedure of the Conduct Board at the beginning of the hearing, she stated, "Once the conduct officer has concluded his offering of evidence the complainant may present an opening statement and offer testimony or witnesses. Then the respondent may present his opening statement and offer the testimony of any witnesses that are in attendance today." [Defendants' Ex. C, pp. 5:48-6:2]. Jane Roe had already stated to the Conduct Board that she was making herself unavailable as a witness. The Conduct Board accepted her statement without question, and without informing Jane Roe, for example, that she could not unilaterally remove herself from the proceedings, or that if the University or the Respondent wanted to call her as a witness, she would be required to answer questions.

(*Ibid.*)

56

### a. *Right to Cross-Examine Complainant*

"Generally, 'due process requires that a hearing before an impartial decisionmaker be provided at a meaningful time, and in a meaningful manner.'" *Booker v. City of Saint Paul*, 762 F.3d 730, 734 (8th Cir. 2014) (quoting *Coleman v. Watt*, 40 F.3d 255, 260 (8th Cir. 1994)). "The most important mechanisms for ensuring that due process has been provided are 'notice of the factual basis' leading to a deprivation and 'a fair opportunity for rebuttal.'" *Senty-Haugen v. Goodno*, 462 F.3d 876, 888 (8th Cir. 2006) (quoting *Wilkinson v. Austin*, 545 U.S. 209, 226 (2005). "Within this general framework different situations may require different specific procedures." *Riggins v. Bd. of Regents of Univ. of Neb.*, 790 F.2d 707, 712 (8th Cir. 1986). "To determine what kind of process is due, courts balance three factors: '(1) the nature and weight of the private interest affected by the challenged official action; (2) the risk of an erroneous deprivation of such interest as a result of the summary procedures used; and (3) the governmental function involved and state interests served by such procedures, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought.'" *Booker*, 762 F.3d at 734 (quoting *Coleman*, 40 F.3d at 260).

In *King v. University of Minnesota*, 774 F.2d 224 (8th Cir.1985), the Eighth Circuit "listed four requirements of due process, *not including the opportunity to cross-examine or confront witnesses*, in the discharge of a tenured professor from a state university: 1) clear and actual notice of the reasons for termination in sufficient detail to enable him or her to present evidence relating to them; 2) notice of both the names of those who have made allegations against the teacher and the specific nature and factual basis for the charges; 3) a reasonable time and opportunity to present testimony in his or her own defense; and 4) a hearing before an impartial board or tribunal." *Riggins*, 790 F.2d at 712 (emphasis added) (quoting *King*, 774 F.2d at 228, in turn quoting *Brouillette v. Board of Directors of Merged Area IX*, 519 F.2d 126, 128 (8th Cir.1975)). The terminated employee in *Riggins* argued "that the University of Nebraska's grievance procedure, which she could have used after her termination but did not, is constitutionally insufficient because it would not have provided her an opportunity to confront or cross-examine witnesses." *Id.* at 711. The Eighth affirmed the dismissal of the appellant's procedural due process claim, stating: "If appellant had availed herself of the University's grievance procedure, she would have had all the protections listed in *King* and a fair opportunity to be heard. Due process in this context does not require more. Moreover, … Riggins chose not to file a grievance. In so choosing, she waived any claim that the grievance procedure did not afford her the process

she was due."[46] *Id.* at 712; *see Flath v. Garrison Pub. Sch. Dist. No. 51*, 82 F.3d 244, 247 (8th Cir. 1996) (affirming summary judgment in favor of school district where teacher claimed her due process rights were violated when she was terminated based on hearsay statements rather than live witness testimony: "[W]e have rejected a discharged employee's argument that a university grievance procedure was constitutionally inadequate because it would not have granted her the opportunity to confront or cross examine witnesses at a post-termination hearing.") (citing *Riggins*); *Hauschild v. Nielsen*, 325 F. Supp. 2d 995, 1007 (D. Neb. 2004) ("[D]ue process does not require that the employee to be terminated have the opportunity to cross-examine or confront witnesses.") (citing *Riggins*).

However, in *Nevels v. Hanlon,* 656 F.2d 372 (8th Cir.1981), which was cited in the *Riggins* decision, the Eighth Circuit held that a discharged state employee was denied due process because the Nebraska Commissioner of Labor, in making his final adverse decision following the employee's appeal to the Merit System Appeal Board (which recommended the employee's reinstatement), relied upon ex parte communications with the employee's supervisor that directly related to the stated reasons for the employee's dismissal. The Court explained: "It is fundamental to a full and fair review required by the due process clause that a litigant have an opportunity to be confronted with all adverse evidence and to have the right to cross-examine available witnesses. Where a party is precluded from exercising this fundamental right, the review procedure is constitutionally defective, and cannot be excused as harmless error." *Id.* at 376 (citations omitted). One district court has concluded that *Nevels* states the law in this circuit because the Eight Circuit in both *Riggins* and *Brouillette* did need to reach the issue. *See Terry v. Murphy*, No. 88-6085-CV-SJ-6, 1990 WL 82659, at *7 & n. 6 (W.D. Mo. June 15, 1990) (also noting that "this is unquestionably a difficult area of the law" and "[i]is thus arguable that *Nevels* and *Riggins* are both unduly rigid in their language, ….").

---

[46] It is the rule in this circuit that "a litigant asserting a deprivation of procedural due process must exhaust state remedies before such an allegation states a claim under § 1983." *Hopkins v. City of Bloomington*, 774 F.3d 490, 492 (8th Cir. 2014) (quoting *Wax 'n Works v. City of St. Paul,* 213 F.3d 1016, 1019 (8th Cir. 2000)), *see also Christiansen v. W. Branch Cmty. Sch. Dist.,* 674 F.3d 927, 935-36 (8th Cir. 2012) (affirming the dismissal of a complaint alleging post-deprivation procedural due process because the plaintiff failed to pursue available post-termination administrative remedies); *Crooks v. Lynch,* 557 F.3d 846, 848 (8th Cir. 2009) ("[T]his requirement is distinct from exhaustion requirements in other contexts. Rather, this requirement is necessary for a procedural due process claim to be ripe for adjudication."). "However, it is not necessary for a litigant to have exhausted available *postdeprivation* remedies when the litigant contends that he was entitled to *predeprivation* process." *Keating*, 562 F.3d at 929 (emphasis in original).

In addition to the uncertainty over whether *Riggins* or *Nevel*s is controlling law with respect to a public employee's right to confront and cross-examine witnesses before being terminated, it is unclear whether the holding in either case should be extended to student disciplinary proceedings. There is no Eighth Circuit decision directly on point.

Plaintiff cites two Sixth Circuit decisions, *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017), and *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018), in support of his argument that he was denied due process by not being allowed to cross-examine Jane Roe.

In the first decision, the Sixth Circuit upheld a preliminary injunction to prevent the suspension of a graduate student who, despite the complainant's failure to appear at the disciplinary hearing, was determined to have violated UC's Student Code of Conduct by committing a sexual assault. While observing that "[t]he right to cross-examine witnesses generally has not been considered an essential requirement of due process in school disciplinary proceedings," *Univ. of Cincinnati*, 872 F.3d at 400 (quoting *Winnick v. Manning*, 460 F.2d 545, 549 (2d Cir. 1972)),[47] the Court concluded that "Defendants' failure to provide any form of confrontation of the accuser made the proceeding ... fundamentally unfair." *Id.*at 396. Significantly, the plaintiff-appellee was "not requesting an opportunity to question [the complainant] 'directly.' ... Rather, plaintiff ask[ed] only to question [her] through the [Administrative Review Committee] panel—a procedure the Department of Education's Office for Civil Rights previously recommended for the victim's wellbeing." *Id.* at 403.[48]

In the second decision, the Sixth Circuit reversed the dismissal of a procedural due process claim brought by a male student (Doe) at the University of Michigan who was accused of sexual misconduct. The university's investigator recommended that the case be closed because the evidence was in equipoise, but the complainant (Roe) appealed. The Appeal Board reviewed the investigator's report and met in two closed-door sessions,

---

[47] The Second Circuit commented in *Winnick* that "if this case had resolved itself into a problem of credibility, cross-examination of witnesses might have been essential to a fair hearing." 460 F.2d at 550. The Sixth Circuit similarly suggested in *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629 (6th Cir. 2005), that "[s]ome circumstances may require the opportunity to cross-examine witnesses, though this right might exist only in the most serious of cases." *Id.* at 636.

[48] This "circumscribed form of cross-examination" was held to be constitutional in an earlier, unpublished Sixth Circuit decision. *See Doe v. Cummins*, 662 F. App'x 437, 448 (6th Cir. 2016).

without considering any new evidence. The Board concluded from its review of statements in the report that Roe's description of events was more credible than Doe, and that her witnesses were more persuasive that Doe's witnesses. The investigator's recommendation was set aside and the university proceeding to the sanction phase. Faced with the possibility of expulsion, Doe agreed to withdraw from the university. The Sixth Circuit determined that the Board's limited review was inadequate and held that "the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *Baum*, 903 F.3d at 578.[49]

Plaintiff's hearing in the present case was held on May 31, 2018, and the Conduct Board's decision expelling him from the University was issued on June 6, 2018. The final decision affirming the Board's decision was entered on July 26, 2018. As of those dates, only the *University of Cincinnati* case had been decided.[50]

To overcome the defense of qualified immunity, a plaintiff must identify either "controlling authority" or "a robust consensus of cases of persuasive authority" that placed the statutory or constitutional question beyond debate at the time of the alleged violation. *Kelsay v. Ernst*, 933 F.3d 975, 979 (8th Cir. 2019). There is no "controlling authority" for the procedural protections that are urged by Plaintiff,[51] and the Eighth Circuit "do[es] not

---

[49] In *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019), the First Circuit declined to adopt *Baum*'s "categorical rule that the state school had to provide for cross-examination by the accused or his representative in all cases turning on credibility determinations." The Court explained: "[W]e have no reason to believe that questioning of a complaining witness by a neutral party is so fundamentally flawed as to create a categorically unacceptable risk of erroneous deprivation. We also take seriously the admonition that student disciplinary proceedings need not mirror common law trials." *Id.*

[50] The *Baum* decision was issued on September 7, 2018. On remand, the district court dismissed all claims for money damages against the individual defendants because "[t]he Sixth Circuit … recognized that [the unconditional right to a live hearing with the opportunity to cross-examine witnesses] that it 'reaffirmed' when it remanded the case … was clearly established, at the earliest, only in 2017, by the decision of the court of appeals in *Doe v. University of Cincinnati*, 873 F.3d 393 (2017)." *Doe v. Baum*, No. 16-13174, 2019 WL 4809438, at *7 (E.D. Mich. Sept. 30, 2019), *appeal docketed*, No. 19-2270 (6th Cir. Oct. 30, 2019).

[51] In *Dillon v. Pulaski Cty. Special Sch. Dist.*, 594 F.2d 699 (8th Cir. 1979) (per curiam) the Eighth Circuit summarily affirmed a district court order reinstating a high school student who was expelled after a teacher allegedly found him kissing a girl in the hallway and he allegedly remarked "what a drag" in a defiant manner when told to stop. The district court held that the student "was denied procedural due process of law by the

consider a consensus based on the decision of a single circuit and a handful of lower courts to be 'robust.'" *Lane v. Nading*, 927 F.3d 1018, 1023 (8th Cir.), *cert. denied*, 140 S. Ct. 537 (Mem) (2019); *see, e.g., Jacobson v. McCormick*, 763 F.3d 914, 918 (8th Cir. 2014) (concluding that "two decisions from other circuits did not place [an] issue beyond debate" in the absence of controlling authority); *Turner v. Arkansas Ins. Dep't*, 297 F.3d 751, 759 (8th Cir. 2002) ("[T]he fact that two circuit cases and fifteen district court cases directly support a proposition and the Supreme Court implicitly supports that same position is sufficient to demonstrate that the law was 'clearly established' ....").

While there is some support for Plaintiff's argument that he was denied due process by not being allowed to confront or cross-examine Jane Roe, Defendant Anaya and her colleagues cannot be held personally liable for this alleged constitutional violation because the law was not clearly established at the time of their actions. *See, e.g., Doe v. Haas*, No. 19CV0014DRHAKT, 2019 WL 6699910, at *11 (E.D.N.Y. Dec. 9, 2019) ("[W]hile the courts have recognized that when credibility is at issue the accused should be provided 'some form' of cross-examination, Plaintiff has failed to cite to any case, decided before the events at issue here, holding that due process requires ... permitting the accused to *personally* cross-examine the accuser, ....") (emphasis in original; footnote omitted); *Doe v. Northern Mich. Univ.*, 393 F. Supp. 3d 683, 697 (W.D. Mich. 2019) (individual defendants held entitled to qualified immunity because "it was only after the disciplinary proceedings of this case that the Sixth Circuit stated in *Baum*, 903 F.3d at 578, that cross-examination is required if the fact-finder must 'choose between competing narratives,' ...."); *Doe v. Univ. of Miss.*, 361 F. Supp. 3d 597 (S.D. Miss. 2019) (while plaintiff stated plausible due process claim based on selection of disciplinary panel and his inability to cross-examine witnesses against him, individual defendants were entitled to qualified immunity given plaintiff's failure to cite a single case that would put defendants on notice that their conduct violated clearly established law); *Doe v. Penn. State Univ.*, 336 F. Supp. 3d 441 (M.D. Pa. 2018) (although undergraduate student sufficiently alleged that public university disciplinary procedures, which prevented him from providing live testimony to disciplinary panel, or challenging testimony of alleged victim of sexual assault through cross-examination, violated his right to procedural due process, individual defendants were entitled to qualified immunity because the law was not clearly established).

---

refusal of school officials to allow him to call the accusing teacher as a witness during his expulsion hearing, in order to help resolve disputed issues of fact." *Id.* at 700. This is not controlling authority because the "holding that the appellee student had a procedural due process right to cross-examine the teacher is limited to the circumstances disclosed by the record [on stipulated facts] before the court in this case." *Id.* (Benson, J., concurring).

### b. *Exclusion of Evidence*

Plaintiff complains that Defendant Anaya excluded from evidence "information regarding Jane Roe's mental state at the time she reported allegations, and mental health disorders; multiple other sexual assault allegations Jane Roe made against Plaintiff, which were found to be without merit; and transcripts of several other phone calls between Plaintiff and Jane Roe from around the same time as the recorded phone call, among other items." (Filing No. 55, p. 16 (citations to record omitted).) Plaintiff contends such evidence was "relevant to the issue of consent," but he has not identified any controlling authority or robust consensus of cases of persuasive authority from which a reasonable person would conclude that the exclusion of such evidence would violate Plaintiff's constitutional rights.

First, regarding any evidence of Jane Roe's mental health, it must be noted that Plaintiff was determined to have sexually assaulted Jane Roe on July 24, 2017, because she did not consent to sexual intercourse, and not because she was mentally or physically unable to resist. Plaintiff has not identified any redacted portion of the hearing packet that he contends should have been presented to the Conduct Board,[52] nor has he shown that he was prevented from offering any evidence on this issue. Plaintiff was not foreclosed from presenting relevant evidence, as he was instructed at the outset of the hearing that "[a]ny discussion or speculation regarding the mental health of either party should not be introduced *unless* it is directly related to any concerns or interactions [that] informed responses of the participants." (SOF ¶ 108; Filing No. 41-4, p. 6 (emphasis supplied).) Also, to the extent Plaintiff may be claiming that Jane Roe's mental health was relevant to her credibility, "[m]ental illness is not a generic badge of incompetence or dishonesty." *United States v. George*, 532 F.3d 933, 937 (D.C. Cir. 2008) (holding that district court did not violate defendant's right to confront witnesses by refusing to allow him to cross-examine his sister, a government witness, about her bipolar disorder). "[S]ome indication is needed that a particular witness's medical history throws some doubt on the witness's competence or credibility." *Id.*; *see United States v. Steinmetz*, 900 F.3d 595, 602 (8th Cir. 2018) (finding no Sixth Amendment violation in district court's limiting criminal defendant's ability to cross-examine his accuser regarding her depression and counseling where defendant made no offer of proof to show relevancy), *cert. denied*, 139 S. Ct. 948

---

[52] Defendants' evidence shows that Anaya redacted "Plaintiff's personal opinion of Jane Roe's alleged mental disorder(s), medication, his personal feelings toward her at the time of the hearing, her alleged suicidal ideation and alleged suicide attempts." (SOF ¶ 89.)

(2019). "[W]hether mental health evidence is sufficiently probative to warrant examination is a fact-intensive determination." *Steinmetz*, 900 F.3d at 602.

Regarding other allegations of sexual assault, the Eighth Circuit has "held that in a sexual abuse case, evidence alleging that the accuser made prior false accusations may be excluded if the evidence has minimal probative value. And the propriety of excluding such evidence is strengthened where the prior incident is unrelated to the charged conduct, and where the defendant intends to use the evidence as part of an attack on the 'general credibility' of the witness." *United States v. Frederick*, 683 F.3d 913, 918 (8th Cir. 2012) (quoting *United States v. Tail,* 459 F.3d 854, 859-60 (8th Cir.2006)).

In the present case, the record shows that Anaya redacted "[i]nformation about the remaining allegations [of sexual assault that Jane Roe made against Plaintiff], other than the July 24, incident, including information regarding the allegations put forth by the other students." (SOF ¶ 89.)[53] She also stated at the outset of the hearing: "I would like to note that there were no findings on two [*sic*] of the charges listed in the official University correspondence and all information to those two charges have been redacted from the record. Discussion on previous sexual history of both the complainant and the respondent should not be introduced except to the extent directly relevant to the parties' course of conduct during the incident in question and is not unduly prejudicial to either party." (Filing No. 41-4, p. 6.) When Plaintiff questioned Anaya by what authority she was excluding such evidence, she referenced Section 7(a) of the Student Code of Conduct, which provides that "[i]n most situations evidence of the past sexual history of either the respondent or the complainant will not be admitted at the hearing except in very limited situations." (*Ibid*.)

UNL's investigator concluded there was insufficient evidence to support Jane Roe's allegations of sexual assault in March 2016 and mid-July 2017 (see SOF ¶ 53), which suggests that Anaya's exclusion of all evidence relating to those allegations may have been procedural error. However, it was not a clearly established constitutional violation. As with the decision of whether to permit questioning about a complainant's mental health, the decision of whether to permit evidence of allegedly false accusations that were made by the complainant is a very fact-specific determination.

---

[53] Defendants argue that "the University and the Plaintiff had agreed to narrow the issue to whether Plaintiff sexually assaulted Roe on the specific encounter in question" (Filing No. 56, p. 6), but Plaintiff made it clear during the pre-hearing conference that he intended to "talk about the entire relationship including the fact that she accused me of sexually assaulting her on four occasions ...." (Filing No. 41-3, p. 7.)

Even if Anaya made a mistake in excluding relevant evidence, "[t]his is the type of mistake that the qualified immunity rule was intended to protect." *Dollar Loan Ctr. of S. Dakota, LLC v. Afdahl*, 933 F.3d 1019, 1026 (8th Cir. 2019). "Qualified immunity protects public officials who act in good faith while performing discretionary duties that they are obligated to undertake." *Kloch v. Kohl,* 545 F.3d 603, 609 (8th Cir.2008). "The issue is not whether the defendant acted wrongly, but whether reasonable persons would know they acted in a manner which deprived another of a known constitutional right." *Herts v. Smith,* 345 F.3d 581, 585 (8th Cir. 2003).

Finally, regarding Anaya's alleged exclusion of transcripts of phone calls, the court cannot tell what evidence Plaintiff is referencing. No due process violation is apparent.

### D. The Merits

Besides the lack of clearly established law to guide Defendants' actions, there is not enough evidence to support a finding that Plaintiff's constitutional rights were violated. As a result, Count VI of the Amended Complaint will be dismissed in its entirety.

In paragraph 6 of his Amended Complaint, Plaintiff alleges that Defendants: "(i) failed to conduct a thorough and impartial investigation; … (iii) … made assessments of credibility and evidentiary weight with respect to each party and witnesses without any ascertainable rationale or logic; (iv) … failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard; (v) … unlawfully utilized a different standard of proof for this proceeding as compared to other University student conduct hearings; (vi) … [engaged in] a lack of due process by not allowing the Plaintiff to present evidence and not allowing Plaintiff to question Jane Roe; … (viii) [had] conflicts of interest that resulted in a biased adjudication; (ix) [failed to create] an official record of the hearing; … (xi) … [improperly included] information in the Fact-Finder's report which the hearing panel and decision maker erroneously interpreted as a determination of responsibility; (xii) … failed to define the policy violation; [and] (xiii) … failed to provide] a rationale for the Decision and Sanction …." (Filing No. 25, pp. 2-3, ¶ 6.) Defendants identified these allegations in their brief as involving potential procedural due process issues (see Filing No. 41, pp. 44-45), and Plaintiff has not indicated there are any other issues that require analysis. In fact, other than arguing that he was denied due process by not being allowed to confront and cross-examine Jane Roe, and by the exclusion of certain evidence as discussed above, Plaintiff has made no response to Defendants' contention that the due process claims alleged in Count VI are without merit.

### 1. Investigation

There is no evidence to support Plaintiff's claim that the university failed to conduct a thorough and impartial investigation. To the contrary, the undisputed evidence establishes that from November 21, 2017, to April 6, 2018, Counley methodically investigated the complaint filed by Jane Roe and, among other things, met separately with both Jane Roe and Plaintiff and received detail accounts from them regarding the allegations contained in the complaint; reviewed documents, including Plaintiff's 106-page written response to the complaint; received witness lists from both parties and interviewed those witnesses; informed Plaintiff of the investigation process and his rights; gave both Plaintiff and Jane Roe the opportunity to respond to each other's accounts and other pertinent material, such as the audio recording; and, finally, prepared a detailed report and recommendation. (See SOF ¶¶ 34-61.) Plaintiff disagrees with Counley's findings, but he has made no satisfactory showing that her investigation was incomplete or that Counley was not impartial.

### 2. Assessing Credibility and Weighing Evidence

Plaintiff's conclusory allegation that Defendants made assessments of credibility and evidentiary weight without any ascertainable rationale or logic also finds no support in the record. Anaya conducted an almost 4-hour pre-hearing conference instructing Plaintiff on how the Conduct Board addresses evidentiary issues, reviewing the hearing packet for redactions, and, finally, disclosing the university's witness and Jane Roe's evidence. (See SOF ¶¶ 75-88, 90-92.) The Board reviewed the hearing packet for at least 6 hours prior to the hearing. (SOF ¶ 132.) During the 3-hour, 15-minute hearing, the Conduct Board gave the parties the opportunity to present their case. (See SOF ¶¶ 98-128.) During their deliberations, the Conduct Board listened to the audio of the conversation between Doe and Roe discussing the July 24th incident before reaching their decision. (See SOF ¶¶ 133-134.) "Specifically, the board based their decision off of the respondent's own admission both in the hearing as well as in the recorded conversation … where the respondent admits complainant did not give consent on July 24, 2017." (SOF ¶ 135.) If proper procedures were followed, the Board's credibility determinations are virtually unassailable. *See Univ. of Arkansas-Fayetteville*, 2019 WL 1493701, at *11 ("Credibility determinations are fully within the purview of university discipline hearing panel conducting a de novo review."); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 894 (N.D. Ohio 2017) ("As for assessing the credibility of hearing witnesses, such a determination is well within the discretion of the disciplinary board, and is not for the courts to second guess.").

### 3. Presumption of Innocence and Burden of Proof

There is no evidence to support a finding that Plaintiff was not presumed innocent or that the Board misapplied the applicable burden of proof.

### 4. Presentation of Evidence and Questioning of Complainant

As discussed above in connection with the individual-capacity claim alleged against Defendant Anaya, there is some recent authority for the proposition that a state-college student who is facing expulsion for alleged sexual misconduct has the right under the Fourteenth Amendment to confront and cross-examine his or her accuser when the case turns on credibility determinations. In this case, however, the Conduct Board determined that Plaintiff admitted during the hearing and in the recorded telephone conversation that Jane Roe had not consented to have sexual intercourse with him on July 24, 2017. (See Exhibit U, June 6, 208 decision letter (Filing No. 45-4) and Exhibit X, July 26, 2018 final decision letter (Filing No. 45-7).)[54] In making this determination, it was not necessary for

---

[54] Plaintiff stated at the hearing that Jane Roe told him to stop when he attempted to initiate sex, but he thought she eventually relented:

[W]hen I initiated sex with [Jane Roe] and started touching her she didn't say well in fairness she did say stop and she said quit trying to fuck me and give me a back rub and rolled over on her belly uh but I gave her a back rub. Uhm it wasn't an hour of me constantly trying to force myself on her as she seems tro [sic] have suggested to the investigator …. I did initiate sex with her and and [sic] she did uh she did initially uh decline and she did so not by stating uhm please put your pants on and go or we are never going to have sex again …. I initiated sex and [Jane Roe] initiated no and then said to give her a back rub and I gave her a back rub and then after the back rub uhm I was lying next to her on the side never once did I pin [her] down I didn't hold her arms down. Uh she never screamed get off of me I never forced myself on her I did touch her. I touched her private area which is something I've done probably at least 100 times if not 150 before and that was part of our custom and practice…. And I am telling you as somebody who had been with [Jane Roe] sexually 100 and something times uhm when I was touching her she put her hand on my hand but she didn't grab it and pull it away or smack me and she didn't scream no-no-no and she didn't scream get out and she knew by this point she knew I had my pants off and I think that even I'm sure I touched her with an erection and she didn't tell me to get out… And uh so I touched her for a while and then she was responding to my touch and so I pulled her underwear over and we had sex…. She didn't scream don't she

the Board to hear directly from the Jane Roe or to permit Plaintiff to question her. *See Univ. of Cincinnati*, 872 F.3d at 405 ("[D]efendants are not required to facilitate witness questioning at every nonacademic misconduct hearing. *Flaim*'s dictate is narrow: cross-examination is 'essential to due proces' only where the finder of fact must choose 'between believing an accuser and an accused.' … The ARC panel need not make this choice if the accused student admits the 'critical fact[s]' against him.") (quoting *Flaim*, 418 F.3d at 641); *Baum*, 903 F.3d at 584 ("This court has long held that cross-examination is unnecessary if a student admits to engaging in misconduct.").[55] Similarly, exclusion of evidence regarding Jane Roe's mental state or alleged false accusations did not violate Plaintiff's right to due process when the Board based its finding on the fact that Plaintiff admitted engaging in sexual intercourse after Jane Roe told him "No."[56]

## 5. Conflict of Interest

The record does not show any discernable conflict of interest, and Plaintiff does not allege any facts in support of his claim of a conflict of interest. "To state a claim for actual

---

didn't jump up she didn't get off the bed she didn't order me to leave her apartment. She didn't kick me, fight me, bite me, hit me, do anything that any reasonable person would do to communicate that there was a lack of consent at this point.

(Exhibit C, Hearing Transcript (Filing No. 41-4) at 28:31-29:31.)

[55] Defendants make an argument that "[d]uring the hearing, [Plaintiff] was provided the opportunity to present evidence, give testimony, and question witnesses present at the hearing, which included Jane Roe. In fact, he was informed multiple times, including at the start of the hearing that he was permitted to call witnesses to testify (which would include Jane Doe, who was at the hearing) and/or submit questions to be asked of Jane Doe, Plaintiff never attempted to call Jane Doe as a witness or submit questions to be asked of Jane Doe at the hearing. Rather, Plaintiff now attempts to impute his own failure to the individuals and the University who afforded him abundant opportunity to present his case." (Filing No. 41, pp. 47-48.) While it is true that Plaintiff did not attempt to question Jane Roe at the hearing, the evidence does not establish that he would have been permitted to do so after she declined to present a case.

[56] The self-serving statement in Plaintiff's affidavit, that Jane Roe did not say "No" when he attempted to have sex with her on July 24, 2017 (Filing No. 55, ¶ 7), which contradicts the statement he made to the Board during the hearing and the statements he made to Jane Roe during their telephone conversation, does not create a genuine issue of material fact. *See Keiran v. Home Capital, Inc.*, 858 F.3d 1127, 1132 (8th Cir. 2017) ("[I]t is black letter summary judgment law that a conclusory, self-serving affidavit will not defeat an otherwise meritorious summary judgment motion.").

bias, the plaintiff must demonstrate that the hearing panel acted with actual bias as a result of personal animosity, illegal prejudice, or personal or financial stake in the outcome." *Univ. of Arkansas-Fayetteville*, 2019 WL 1493701, at *10 (quoting *Ikepeazu*, 775 F.3d at 254). In the absence of actual bias, "hearing panel member are given the presumption of honesty and integrity." *Id.* (quoting *Ikpeazu* at 254).

### 6. Policy Violation and Rationale for Decision

Finally, there is no evidence in the record to support the rest of the errors alleged by Plaintiff. The University maintained a record during the entire conduct proceeding, which Plaintiff had multiple opportunities to review and inspect in accordance with the Student Code of Conduct. Furthermore, a rationale was provided to Plaintiff for the decision and sanction: Plaintiff was found to have violated the Student Code of Conduct by the greater weight of the evidence, and was expelled because of the "seriousness of the violation and apparent lack of remorse or recognition that sex without consent is sexual assault." (Exhibit U, decision letter (Filing No. 45-4).)

Plaintiff may disagree with the University's policy, but that is not the issue before the court. Rather, the issue is whether Plaintiff was afforded procedural due process "by way of adequate notice, definite charge, and a hearing with opportunity to present one's own side of the case and with all necessary protective measures." *Jones*, 431 F.2d at 1117. The court finds Plaintiff has not produced sufficient evidence to demonstrate that he was denied procedural due process by any Defendant.

## VII. CONCLUSION

Eleventh Amendment immunity bars Plaintiff from seeking to recover monetary damages on the official-capacity claims alleged against Defendants Johnson, Bellows, Counley, and Anaya, but does not preclude Plaintiff from seeking prospective injunctive relief, such as reinstatement or a new hearing. These four Defendants in their individual capacities are not entitled to quasi-judicial or other absolute immunity, but they are entitled to qualified immunity with respect to all claims alleged in Count VI of Plaintiff's Amended Complaint because a reasonable person would not have known that the actions taken by each individual Defendant would deprive Plaintiff of his right to due process under the Fourteenth Amendment. Moreover, Plaintiff has failed to present sufficient evidence to show that his constitutional rights were, in fact, violated by these Defendants.

Accordingly,

IT IS ORDERED that Defendants' motion for partial summary judgment (Filing No. 39) is granted and Count VI of Plaintiff's Amended Complaint is dismissed with prejudice. The clerk of the court shall note on the docket sheet that Defendants Johnson, Bellows, Counley, and Anaya, in both their individual and official capacities, are no longer parties to this action.

Dated this 3rd day of April, 2020.

BY THE COURT:

*Richard G. Kopf*

Richard G. Kopf
Senior United States District Judge